VALENTINE and others, Respondents, vs. PATRICK WARREN CONSTRUCTION COMPANY, Appellant.

*January 6—February 3, 1953.*

144

146

148

150

154

For the appellant there were briefs by *Beggs & Lawton* of Madison, and *Chester R. Wellman* of Chicago, Illinois, and oral argument by *Mr. John A. Lawton* and *Mr. Wellman*.

For the respondents there was a brief by *Randolph R. Conners* of Madison, and *Kahn & Kahn* of St. Louis, Missouri, and oral argument by *Mr. Meyer M. Kahn* and *Mr. Conners*.

CURRIE, J.   The crucial issue on this appeal is the right of the defendant Warren to have rescinded its subcontract with Capital which rescission was effected by Warren's registered-mail letter of July 22, 1947. This is not the ordinary case where the question of right to terminate depends upon whether there has been a material breach by the party against whom cancellation is attempted, but instead involves construction of a particular clause in the written contract itself conferring such right of rescission in the event of certain specified occurrences.   •

Article 4 of the contract between the parties conferred the right upon Warren to rescind upon giving three days' notice:

"If at any time during the prosecution of the work of this contract, the subcontractor [Capital], not being hindered by causes beyond his control, fails to maintain a sufficient working force, or if it shall become evident to the contractor [Warren] that the work is not being prosecuted with proper diligence to complete said work so as not to delay the progress of the building, or if the subcontractor ·shows gross carelessness or incompetency, or if the subcontractor fails, refuses, or neglects to comply with the contract . . ."

Warren in its letter of rescission specified three grounds or reasons for the cancellation of its contract with Capital, the same being, (1) refusal to supply sufficient manpower, (2) refusal to supply sufficient materials and equipment, and (3) refusal to furnish sufficient funds to meet pay roll and prosecuting contract, and stated that in order "not to delay progress of construction, we are forced to invoke clauses in your contract to complete your work with our own forces."

Before considering separately these three grounds for rescission it is necessary to first point out one very serious error on the part of the referee which becomes apparent from a statement made in his memorandum opinion, in which he states that the contract between the parties provided no time for completion by Capital of the work it undertook under the contract. While in a strict literal sense this may be true, nevertheless, Article 2 of the contract specifically provided that Capital *"shall perform all work as directed and at such times and in such manner so as not to delay the completion of the buildings."* We construe the words *"as directed"* as conferring upon Warren and the architect the right to determine within the bounds of reason the manpower which Capital was required to have on the job in order that the work might progress so as not to delay the building. Furthermore, a deadline of October 1, 1947, had been set by Warren as to when the painting of the interior of the assembly building had to be completed, as it had definitely committed itself with Ford as to such completion date.

With this in mind we will now examine the evidence bearing on the question of whether Capital did consistently fail and refuse to supply sufficient manpower, thereby breaching Article 2 of the contract. While it is true that the weather conditions during January, February, and the first half of March, 1947, did not allow much construction to be carried on, there was back-priming that was done by the painters. From February 19, 1947, to March 13, 1947, Capital had

no painters on the job because of trouble with the painters' union, and while the testimony is in conflict as to whether such trouble may not have been due to a pay-roll check of Capital's which "bounced," we are bound by the referee's finding that such union trouble was due to causes beyond Capital's control.

The concrete floor in the first 10 bays had been poured first, and then on April 22, 1947, Warren commenced to pour the remainder of the floor of the assembly building, completing the same, except for one of the 40 bays, by July 19, 1947. Never at any time from April 22, 1947, down to the date of rescission on July 22, 1947, did Capital's painters keep pace with the floor-pouring operations as repeatedly urged by Warren's superintendent. Warren's superintendent repeatedly requested Capital to put on more men so that the ceiling could be painted as the pouring progressed so that the painting would be completed ahead of the electrical, heating, and ventilating subcontractors coming in and doing their work. Mr. Bell, a construction engineer of fifty years' experience who was the representative of the architect on the job, testified without dispute that it was necessary for him to delay the installation of the electrical fixtures for three months until the ceiling was painted, and then he had to let the electricians go in even though the ceiling was not painted. And he also testified that the installation of the heating and ventilating ducts delayed the painters, but this should not have done so because the painters should have had the ceiling painted ahead of the ducts.

As of the week ending April 23, 1947, Capital had but 12 painters and 1 foreman on the job, and this number continued until the week ending June 11, 1947, although both Warren and the architect were pressing Capital during such period to put more painters on the job; and the week ending June 18, 1947, the number of Capital's employees on the job was increased to 17, and was still further increased until

it got up to 26 on July 9, 1947, and stayed at such number until July 22, 1947, when the notice of rescission was given. The architect's report to Ford of June 28, 1947, stated that Capital had but 25 painters on the job and that 25 more were needed. The architect's report of July 5, 1947, stated that Capital was still short of painters, and the architect's further report of July 12, 1947, made at a time when Capital had attained its maximum force of 26 painters, stated that the contractor had a few more painters "but is still short."

The referee in his opinion placed great stress upon a statement made by Bell in the architect's report to Ford of July 19, 1947, to the effect that Capital was "making better progress and expects to have more painters next week." However, Bell, who, as the architect's representative on the job was a disinterested witness, testified that the need for 50 painters still existed on July 22, 1947. After July 22d, when Warren itself hired the painters, it increased the number of painting employees to 47 by the week ending July 30, 1947; and from August 6, 1947, to August 19, 1947, had from 55 to 57 painters on the job. It does not appear from the record how many painters Busch & Latta had on the job after August 19, 1947, but the reason Warren engaged them at a contract price of approximately $25,000 over the lowest bid submitted for completing the painting subcontract was because of their large size in an attempt to insure completion of the assembly building by October 1st, so it is reasonable to assume that they did not cut down the number of painters which Warren had on the job when they took over. Even then the painting of the assembly building was not completed until October 8, 1947. (The office building was not completed until the summer of 1948, but such delay was approved by Ford.) This establishes that the architect's estimate of 50 painters which Capital should have had on the job was not an excessive estimate. In any event, under the contract it was for Warren to determine the manpower required, and Capi-

tal was violating its contract when it failed to engage more painters as demanded by Warren. Mike Valentine, one of the partners of Capital who from April 15th to July 22d was superintending the painting work, admitted that Warren had repeatedly requested that more painters be employed than Capital was employing. He also testified that Capital had no difficulty in hiring painters. Capital makes no contention that the failure to have more painters on the job from April 22, 1947, to July 22, 1947, was due to any causes beyond Capital's control, but argues that they were not needed.

Capital attempted to excuse its failure to have more painters on the job because of a dispute with Warren over some smudged ceilings in the first 10 bays caused from the smoke of salamanders which had been used in order to keep that portion of the building warm. Such dispute did exist over a several weeks' period, Capital refusing to do any work in the 10 bays until it was determined whether it would be paid for first cleaning off the smudge. The dispute was finally resolved by having Capital brush off the ceiling of 5 of the bays before painting the ceiling, and, as to the remaining 5 bays, painting was done over the smudge with the consent of Ford. However, Bell testified that this dispute in no way delayed the painting work inasmuch as after April 22, 1947, additional floor beyond the first 10 bays was continuously poured and Capital was unable to keep up with the painting in this additional space to the extent necessary to keep ahead of the other trades.

The referee made no specific finding with respect to Capital's failure to have sufficient manpower on the job, unless that part of finding Seven in which the referee found that Capital prosecuted the work "with reasonable diligence and dispatch and without unreasonable delay, until July 22, 1947," was intended to constitute a finding on the question of manpower. If it was so intended, then it is against the great weight and clear preponderance of the evidence and

cannot stand. The delays due to causes beyond Capital's control referred to by the referee in finding Thirteen occurred prior to April 22, 1947, and therefore have no relevancy with respect to the period of April 22 to July 22, 1947.

We will next consider the further ground stated by Warren as a reason for rescission, viz., that Capital had failed to furnish sufficient funds to meet pay rolls. In addition to issuing approximately $1,000 in pay-roll checks in May and June, 1947, which "bounced" because of insufficient funds to Capital's credit in the bank to pay the same, Capital's check for the June 9, 1947, pay roll did not reach St. Louis in time, and Warren advanced the amount of that pay roll and then was repaid two days later by Capital. Capital also failed to meet the pay roll of July 16, 1947. It attempted to borrow money from a Madison bank where it did business but the bank refused to loan Capital any more money because it felt that Capital's loan from the bank was already too large. On July 16, 1947, Capital's bank balance was but $32.02. Joseph Valentine, one of the partners of Capital, testified that one of the reasons why Capital made no further effort to pay the pay roll of July 16th was because the partners thought that Capital was going to be "thrown off" the job by Warren anyway, which is an admission that the partners of Capital knew as of July 16th that Warren was dissatisfied with Capital's performance of its contract.

Article 1 of the contract between Capital and Warren required Capital *"to furnish* all labor, material, and equipment necessary to complete all work called for" under the contract. This court in *Sinaiko v. Hustad* (1926), 189 Wis. 298, 302, 206 N. W. 976, held that the obligation *"to furnish"* labor and materials by a contractor in a building contract included a duty *"to pay for"* the same. In the instant case, therefore, it must be held that the obligation on the part of Capital to furnish labor and materials included the duty to pay for the same when due.

The referee was in error when he found in finding of fact Ten, that on July 16, 1947, when Capital defaulted on its pay roll on that date, Warren then owed Capital, on account of work done by Capital on the project, between $3,000 and $4,000 over and above the amount of such pay roll. The referee seems to have entirely overlooked the fact that Article 3 of the contract between the parties *only placed the obligation on Warren to make payments to Capital when Warren received payments from Ford.* On July 16, 1947, Warren had but $1,043.40 in its possession which had been paid to it by Ford to cover work done by Capital, as indicated by Exhibits 90 and 92. Ford did not pay to Warren the $5,420 due on the estimate to cover the June work of Capital until July 18, 1947, *two days after Capital had defaulted on the pay roll of July 16th.* At no time before rescission did Capital make any complaint to Warren about any scaling down of its estimates or that Warren had paid Capital less than was due Capital.

This failure by Capital to meet the July 16th pay roll was a serious breach of the contract and clearly indicated that Capital would be unable to finance its pay rolls in the future performance of the contract. The amount of the July 16, 1947, pay roll with the 10 per cent added thereto to cover taxes, insurance, and social security, as stipulated by Capital's counsel, was $2,927.34. Capital's July 23d pay roll with the 10 per cent added for taxes, insurance, and social security, amounted to $3,285.25, or a total for these two pay rolls of $6,212.59. After paying these two pay rolls, Warren had left but a balance of $250.81 on moneys received from Ford which was owing to Capital. Capital would have no further moneys due from Warren until it filed its estimate for the July work and such estimate had been paid by Ford. If the contract had not been rescinded on July 22d, Capital would have had a minimum of at least two more pay rolls (more likely three) to finance before it would receive payment on

the July estimate, and Warren was justified in concluding from the failure to meet the July 16th pay roll, and the past record of Capital's checks which had "bounced," that Capital would be unable to finance its future pay rolls. Up until the week end of June 11, 1947, Capital had but 13 employees on its pay roll on this project and if the pay roll had remained at that figure it probably could have continued to finance such pay roll from one month to the next until it had received moneys on the previous month's estimate. However, when the number of employees on the pay roll was doubled from 13 to 26, this increase in pay roll was beyond Capital's means to finance. This fact may also account for the reason why Capital did not increase the working force to the number of men requested by Warren.

The third reason advanced by Warren in its letter of July 22, 1947, for rescinding the contract of Capital, was Capital's failure to supply sufficient materials and equipment. As to failure to furnish sufficient equipment it is necessary to consider only the item of rolling scaffolds. These scaffolds were to be placed on the newly poured concrete floor so that Capital's painters could paint the ceiling and keep ahead of the other subcontractors. In May, when Capital started to paint the ceiling, it had but 3 or 4 of such scaffolds (which Capital rented) and it should have had at least 6 or 8 in order to keep up with the pouring of the floor. At the time of rescission Capital had but 5 of such rolling scaffolds and immediately thereafter when Warren took over the painting it procured 7 more of the same, as 12 were then required on the job. As to the items of materials it is undisputed that Capital failed to pay Detroit Graphite Company $5,509.50 for paints furnished on the job which amount Warren was subsequently compelled to pay. Of this $5,509.50, $3,121.85 thereof had been invoiced by Detroit Graphite Company to Capital on or before May 22, 1947. The invoices to Capital for these paints granted a discount if paid within ten days and terms were "net 30 days," meaning that after thirty days

the amount of the invoice was past due. Therefore, as of July 22, 1947, $3,121.85 of the amount owing to Detroit Graphite Company by Capital was past due and delinquent. The referee made no finding of fact regarding failure to provide sufficient equipment, or to pay for materials.

On the basis of the breaches of the contract hereinbefore summarized we hold that Warren was entitled to rescind the contract with Capital as of July 22, 1947, pursuant to the cancellation clause contained in Article 4 of the contract. There is, however, a further question to consider, and that is the failure of Warren's letter of rescission to specifically give Capital three days' advance notice of such attempted rescission. Such three days' written notice was specifically required under the provision of Article 4 of the contract and the referee in his conclusions of law held that such failure of Warren's letter of July 22, 1947, to specifically give three days' notice was in itself a breach of contract by Warren.

Warren's letter of rescission did, however, state: "In order that operations under your contract shall proceed in accordance with your contract and so as not to delay progress of construction, *we are forced to invoke clauses in your contract* to complete your work with our own forces." Furthermore, Capital made no attempt to assert any right to continue on the project for the three-day period beyond July 22d.

In *Amberg Granite Co. v. Marinette County* (1945), 247 Wis. 36, 18 N. W. (2d) 496, this court had before it a contract by the plaintiff to furnish granite for the building of the Marinette county courthouse. The contract contained a clause giving the county the specific right to rescind for breach by the plaintiff by giving plaintiff seven days' written notice of such cancellation. Defendant rescinded the contract for breach by the plaintiff by a written notice which stated that it was made "pursuant to the provisions of said contract" but contained no statement that defendant was being given seven days' notice of such cancellation. Plaintiff, as does Capital in the instant case, contended that the termi-

nation was wrongful and of no effect because of failure to give the seven days' notice. This court held against plaintiff on this point and in its decision stated (p. 43) :

"However, the notice stated that the termination is made 'pursuant to the provisions of said contract.' It follows, therefore, that the notice contemplated a lapse of seven days before it became effective. *And in any event, there could be no resulting prejudice to plaintiff for it had available for its purposes the seven days.* Plaintiff was warned and although it might have resisted any attempt to remove it from the job during the seven days, it cannot complain that the notice was not effective." (Emphasis supplied.)

We believe the *Amberg Granite Co.* decision is controlling in the instant case. Capital had available to it the period of three days subsequent to the giving by Warren of the notice of cancellation in which to have cured its default. However, Capital made no attempt to do so and a large part of its default at least was beyond its power to remedy in such three-day period.

Having determined that Capital breached its contract to the extent that it entitled Warren to rescind the same the next question which arises is whether Capital is entitled to recover anything from Warren over and above the payments which it had received under the contract prior to rescission. The applicable rule is to be found in Restatement, 2 Contracts, p. 623, sec. 357 (1), which section is entitled "Restitution in Favor of a Plaintiff Who is Himself in Default," as follows :

"Where the defendant fails or refuses to perform his contract and is justified therein by the plaintiff's own breach of duty or nonperformance of a condition, but the plaintiff has rendered a part performance under the contract that is a net benefit to the defendant, the plaintiff can get judgment, . . . for the amount of such benefit in excess of the harm that he has caused to the defendant by his own breach, in no case exceeding a ratable proportion of the agreed compensation, . . ."

Comment *g* appearing under such section of Restatement, 2 Contracts, p. 627, further states:

"The plaintiff's right to restitution is merely to the excess of benefit received over the harm suffered. It is necessary for the plaintiff to show with a reasonable degree of certainty that there is such an excess and its amount, in order to get judgment. In no case will the benefit received by the defendant be reckoned at more than a proportionate part of the agreed price of full performance."

Illustration 3 appearing under Restatement, 2 Contracts, p. 628, sec. 357 (1), elucidates the above rule, and we quote such illustration as follows:

"A contracts to erect a building for B, who promises to pay $10,000 on completion. After spending $8,000 on the work, A becomes insolvent and cannot complete it. The uncompleted building is worth $7,000 as an addition to B's property. It costs B $4,000 to complete the building, and he loses $500 in rent because of delay. A can get judgment against B for $5,500—this being the value of the part performance less the harm caused by the breach."

5 Williston, Contracts (rev. ed.), pp. 4140–4144, secs. 1482, 1483, explains that this rule, which permits a party who has breached a contract to recover under certain circumstances for work already performed on the contract, is based upon the theory of quasi contract that it would be unjust to permit the defendant to be enriched at the expense of plaintiff. The author states (p. 4144):

"The true measure of quasi-contractual recovery where the performance is incomplete but readily remediable, is 'the unpaid contract price less the cost of completion and other additional harm to [the defendant] except that it must never exceed the benefit actually received by [him].' This is the net benefit by which the defendant is enriched."

Exhibit 108 is a computation disclosing that Warren sustained a net loss of $9,902.39 as a result of Capital's breach

of its contract and Warren having to take over the completion of the painting on the Ford project. Such exhibit discloses the following:

*Total amount expended by Warren*
*for painting:*

| | |
|---|---:|
| Capital Decorating Co. | $30,891.60 |
| Busch & Latta | 66,500.00 |
| Warren labor | 25,832.82 |
| Detroit Graphite | 25,229.36 |
| Shell Oil Company | 471.20 |
| Patent Scaffolding Co. | 1,406.00 |
| The Glidden Co. | 503.62 |
| Fagans Painting Co. | 910.13 |
| Devoe & Raynold | 243.60 |

$151,988.33

Due Detroit Graphite Co. for materials unpaid (and which were subsequently paid for by Warren) .............................. 5,509.50

Total cost to Warren....................$157,497.83

*Less:*
Original contract price with Capital plus boilerhouse and oil house ......................$108,000.00
Escalation ................... 14,331.53
Adjustment for amount paid Busch & Latta beyond price for which subcontract could be let to another bidder.............. 25,263.91

$147,595.44

Net loss............................$ 9,902.39

The item of $25,832.82 shown above as having been expended by Warren for labor includes the $6,212.59 covering the pay rolls of Capital for July 16 and July 23, 1947, advanced by Warren. The amount shown as having been

paid to Busch & Latta excluded an additional sum of $3,500 paid Busch & Latta by Warren for "gunite" painting, which at the time the subcontract was let to Busch & Latta it had been incorrectly assumed Capital had already performed, but which $3,500 item is in dispute. It will also be noted that an adjustment of $25,263.91 was deducted in the above computation to cover the amount which was stipulated by counsel for both parties should be deducted because of Warren having let the subcontract to Busch & Latta when it could have let the same to other reliable painting contractors at a saving in cost of approximately $25,000.

Under the rule of damages set forth in Restatement, Contracts, and Williston, Contracts, hereinbefore quoted, Capital would be entitled to recover nothing further from Warren beyond the $30,891.60 already paid to it by Warren on the basis of the above loss sustained by Warren of $9,902.39, for the work performed by Capital.

The referee, in his memorandum opinion, pointed out that there were excessive purchases of paints by Warren charged against the job, and that some paints were stolen off the job as Warren did not maintain an inventory control of materials. However, the burden of proof was upon Capital, in so far as its cause of action to recover damages against Warren is concerned, based as it has to be upon the theory of unjust enrichment, to establish what actual payments made by Warren for labor and materials to complete Capital's subcontract were not properly chargeable against the project. Capital has failed to establish that Warren's expenditures for paints were excessive by an amount greater than $9,902.39.

While Capital, because of its breach of the contract, is therefore entitled to recover no further for the work performed by it, it, nevertheless, is entitled to recover from Warren for the value of the equipment it had on the job on July 22, 1947, which equipment was taken over by Warren and used to complete the work. Article 4 of the contract gave

Warren the right to use such equipment without charge for such use. The referee found the value of such equipment to be $900, and Warren makes no contention that this finding was not supported by the evidence, nor does the evidence disclose that Warren after the completion of the project returned, or offered to return, such equipment to Capital. This $900 item was one of the items of damages listed by the referee in finding Twenty, and Capital's breach of the contract would not preclude it from recovery of this item.

This brings us to the counterclaim of Warren against Capital. This is based upon the specific clause in Article 4 of the contract which provided, "the subcontractor [Capital] shall be liable in damages for all moneys *necessarily expended* by the contractor to procure completion of the work required by this contract." The referee in finding Seventeen found that Warren suffered no money damages which could be chargeable to Capital in completing the painting project. The referee in his memorandum opinion, in which he discusses findings Seventeen and Twenty, gives his reasons therefor. It appears therefrom that the referee was in error in disallowing the $5,509.50 item owing by Capital to Detroit Graphite Company, which Warren subsequently paid, and in stating that Capital was entitled to additional money coming under the escalation clause (which protected Capital for increase in cost of labor and materials). Warren's computation (Exhibit 108) did give Capital full credit for all the escalation it was entitled to. However, there is a basis for the referee's statement that that amount which was expended by Warren for paints in completing the project was excessive, and that there is evidence that some paints had been stolen.

When the subcontract was made with Busch & Latta, Warren agreed to supply the paint. The testimony shows that Warren complained that Busch & Latta were extravagant in their use of paint, and they undoubtedly would have

been much more saving 'thereof if the cost of the same had come out of their pockets instead of being paid for by Warren. Furthermore, there is testimony to support a statement of the referee made in his memorandum opinion that the materials on hand for which Warren was responsible were *"purloined and stolen from this project right and left."*

The burden of proof of establishing the counterclaim was upon Warren. Under the wording of its contract with Capital, Warren had the burden of proving that all sums disbursed by it in completing the contract were *"necessarily expended."* We, therefore, cannot hold that the referee's finding of fact, that Warren suffered no money damages which can be chargeable to Capital in completing the painting job, is against the great weight and clear preponderance of the evidence.

Capital contends that the trial court· committed error in extending the time for filing the bill of exceptions. The ninety-day period permitted under sec. 270.47, Stats., for the filing of the bill of exceptions by Warren, expired November 5, 1951. Warren did not serve its order to show cause why an order should not be entered extending the time for serving the bill of exceptions until March 31, 1952.

The reasons advanced in the affidavit of counsel supporting the application for extension of time to serve the bill of exceptions are as follows: That at the time notice of entry of judgment was served on August 7, 1951, there was not available an extra transcript of testimony, and although such extra copy was immediately ordered, it was not furnished until late in December, 1951; and that there were 121 exhibits, many of which included books and records, in all totaling thousands of pages in length, which had to be copied and proofread in order to have a copy of the same to serve as part of the bill of exceptions upon Capital. The trial court in its order extending the time for filing the bill of exceptions

found that the allegations of such supporting affidavit of counsel were true and that the same constituted excusable neglect.

Sec. 269.45 (2), Stats., provides as follows:

"After the expiration of the specified period or as extended by any previous order, the court may in its discretion, *for like cause,* upon notice, extend the time where the failure to act was the result of *excusable neglect;* except the time for appeal." (Emphasis supplied.)

The words *"for like cause"* of the above statute mean that the cause for granting an order extending time to serve a bill of exceptions is the same after the expiration of the ninety-day period as before. However, that which may have been *"excusable neglect"* which delayed the filing of the application for extension beyond the ninety-day period can thereafter cease to be *"excusable neglect"* due to the lapse of further time. In this instance, Warren knew long before March 31, 1952, the reasons why it was unable to serve a bill of exceptions sooner. If this court were passing on the question originally, and not in review, we would have denied the application for extension because of Warren's long delay in applying for the order extending time. However, the order granting the extension is a discretionary one, and we cannot hold as a matter of law that the trial court abused its discretion in granting the order.

*By the Court.*—Judgment modified so as to reduce the amount thereof, exclusive of costs and disbursements, to $900, and, as so modified, is affirmed. Neither party to have costs on this appeal. Appellant to pay clerk's fees.

BROADFOOT, J., dissents.
BROWN, J., took no part.