GEORGIADES, Respondent, vs. GLICKMAN and others, Co-partners, Appellants.

*February 7—March 6, 1956.*

258

For the appellants there was a brief by *Geffs, Geffs, Block & Geffs* of Janesville, and oral argument by *Eli Block.*

For the respondent there was a brief by *Moss & Wickhem* of Janesville, and oral argument by *John C. Wickhem.*

CURRIE, J.   The issues presented on this appeal are as follows:

(1) Whether in computing the net income from operations of the partnership there should be deducted the salary of the defendant Robert H. Karatz as general manager of the partnership's theater business;

(2) What rate of depreciation should be used as a deduction against gross income in computing the net income in which plaintiff was to share;

(3) Should operating losses from prior years be carried forward in computing the net income to which plaintiff was entitled to share as to a fiscal year in which the partnership had made a profit from operations;

(4) Is plaintiff barred from recovering any additional compensation based upon a share of the net income of the partnership for the last fiscal year covered by the employment contract because of the early termination of such contract on January 20, 1953; and

(5) Is plaintiff entitled to interest on any additional compensation found to be due under the contract?

The pertinent provision of the employment contract reads as follows:

"In addition to the compensation provided in paragraph 3 hereof employee shall as additional compensation for such services to employer be entitled to receive for the first year of

the term of this agreement five per cent (5%) of the net income to employer during such year from operations of theaters now or hereafter owned by employer in the state of Wisconsin, and for each of the second and third years of the term of this agreement ten per cent (10%) of the net income to employer during each of such years from operations of theaters now or hereafter owned by employer in the state of Wisconsin. Such additional compensation shall be due and payable not later than seventy-five (75) days after the close of the fiscal year during which such income is earned.

"The term 'net income from operations' as used herein means (a) the gross income to employer, other than capital gains, from the operations by employer of theaters now or hereafter owned by it in the state of Wisconsin less (b) all expenses, deductions, and credits attributable to such operations which would be allowable under the Federal Income Tax Laws (including the compensation and additional compensation herein provided for) for purposes of federal income taxes less (c) an amount equal to the federal and Wisconsin state income taxes which will be payable by reason of the operations of theaters now or hereafter owned by employer in the state of Wisconsin were such operations the only source of income and/or losses of the employer, *computed as though the employer were a corporation and subject to income taxation as such;* provided that such deduction for employer income taxes shall in no event exceed twenty-five per cent (25%) of the difference between gross income as defined in (a) hereof and expenses, deductions, and credits as defined in (b) hereof." (Italics supplied.)

Whether the salary paid by the defendants to Robert H. Karatz as general manager was deductible as an expense from gross income in computing net income in which plaintiff was to share is dependent on whether the italicized words in the above-quoted contract provision are applicable to the expenses and deductions of clause (b), as well as to the method of computing the hypothetical amount of federal and Wisconsin income taxes to be deducted under clause (c). It is plaintiff's contention that such italicized words only apply to that method of computing the hypothetical income taxes to

be deducted under clause (c) and have no application whatever to clause (b). Plaintiff denies that there is any ambiguity which would permit the introduction of evidence as to the intentions of the parties or of any practical construction of the clause of the contract by the parties subsequent to the signing of the employment contract. The learned trial court upheld these contentions of the plaintiff and rejected the evidence offered to show the intent of the parties at the time of negotiating the contract and their subsequent practical construction of this particular clause of the contract.

On the other hand, the defendants point out that the entire paragraph providing a method of computing *"net income"* consists of a single sentence and that the italicized words *"computed as though the employer were a corporation and subject to income taxation as such"* are set off by a comma from the preceding part of the sentence, which comma would have been entirely unnecessary if such italicized words were only to be considered as applicable to clause (c) and not to clause (b).

If the italicized words only modify clause (c) and not clause (b), the salary of Robert H. Karatz would not be deductible from gross income to determine the net income. This is because he was also a member of the partnership and salaries paid partners are not deductible in partnership income-tax returns for either federal or state income-tax purposes, but are considered part of the distributable income of the partner receiving the same. However, if the italicized words are applicable to clause (b) then such salary would be deductible as a proper operating expense of a corporation.

We consider that the insertion of the comma before the italicized words does present an issue of interpretation. The cases of *Service Investment Co. v. Dorst* (1939), 232 Wis. 574, 577, 288 N. W. 169, and *Greenough v. Phoenix Ins. Co.* (1910), 206 Mass. 247, 251, 92 N. E. 447, hold that, although the general rule is that a modifying clause is ordi-

narily to be confined to the last antecedent, this does not always apply, and punctuation may be resorted to when it tends to throw light upon the meaning of the language.

3 Williston, Contracts (rev. ed.), pp. 1807, 1808, sec. 629, suggests that the test, of whether a written contract is so unambiguous as not to render admissible any testimony of surrounding circumstances, is dependent on whether the words used are so clear that the offered evidence "would not persuade any reasonable man that the writing meant anything other than the normal meaning of its words would indicate." The author quotes with approval the following statement made by Judge LEARNED HAND in *Eustis Mining Co. v. Beer, Sondheimer & Co.* (D. C. 1917), 239 Fed. 976, 985:

"All the attendant facts constituting the setting of a contract are admissible, so long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that, if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might 'contradict' the contract—that is, the actual words should be remembered to have a higher probative value, when explicit, than can safely be drawn by inference from surroundings. Yet, as all language will bear some different meanings, some evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include."

Professor Corbin, in his recent excellent work on the law of contracts, states (3 Corbin, Contracts, p. 70, sec. 542):

"There are, indeed, a good many cases holding that the words of a writing are too 'plain and clear' to justify the admission of parol evidence as to their interpretation. In other cases, it is said that such testimony is admissible only when the words of the writing are themselves 'ambiguous.' *Such statements assume a uniformity and certainty in the meaning of language that do not in fact exist; they should be*

*subjected to constant attack and disapproval."* (Emphasis supplied.)

Among the surrounding circumstances that are admissible for the purpose of interpreting the language of a contract are the *"acts and statements of the parties antecedent to and contemporaneous with the making of the contract."* 3 Corbin, Contracts, p. 72, sec. 543.

The plaintiff was represented in the negotiation of the instant contract of employment by the Chicago law firm of Winston, Strawn, Shaw & Black. Prior to the execution of such contract on March 6, 1950, correspondence took place between such law firm and the attorneys representing the defendants with respect to changes to be made in a preliminary draft of the contract. Under date of March 1, 1950, Winston, Strawn, Shaw & Black wrote a letter to defendants' attorneys in which appeared this highly significant statement with reference to the paragraph of the contract covering the method of computation of the net income of the partnership in which plaintiff was to share:

"It is further understood and if you do not agree, please so advise, that none of the partners, *with the exception of Robert Karatz, will draw a salary from the partnership* and that their only remuneration will be in the form of distribution of profits. We have no desire to burden this contract with unnecessary detail and so will insert no provision with regard to this matter into the contract as long as you agree that our understanding is correct." (Italics supplied.)

This clearly indicates that it was plaintiff's intention that the salary of Robert H. Karatz was to be deducted from gross income in determining the net income of the partnership in which plaintiff was to share.

This intention is further corroborated by the subsequent practical construction which the parties place upon such paragraph of the contract governing the computation of the

net income of the partnership. From time to time during the term of the contract the defendants supplied plaintiff with operating statements in which the salary of Robert H. Karatz was deducted as an operating expense and plaintiff took no exception to such deduction.

Pursuant to the demand of defendants made before trial, the plaintiff served a bill of particulars upon the defendants which was verified under oath by the plaintiff. Such bill of particulars was correlated with an operating statement which defendants had supplied to the plaintiff, and such bill of particulars set forth the respects in which plaintiff took exception to such operating statement. It contained this significant statement with reference to the deduction of the salary of Robert H. Karatz in the operating statement covering the fiscal year ending October 31, 1951:

"Overstated R. H. Karatz salary. The amount as shown on the original statement was $10,400. Not more than $\frac{1}{3}$ of this amount is properly allocable to the operations covered by the contract; hence the statement contains an overstatement of R. H. Karatz's salary in the following amount: $7,933.33."

The bill of particulars also set forth substantially the same objections to the deductions made for the salary of Robert H. Karatz in the operating statement for the two ensuing fiscal years of the partnership.

We thus have the practical construction on the part of the defendants evidenced by their deduction of all of the salary of Robert H. Karatz in the operating statements supplied to the plaintiff and the concurrence of the plaintiff therein by not objecting to the defendants' right to make such deduction but only taking issue with part of the amount so deducted. The practical construction of the parties placed upon a provision of a contract is entitled to great weight. *Will of Greiling* (1953), 264 Wis. 146, 154, 59 N. W. (2d) 241; *Standard Sewing Equip. Corp. v. Motor Specialty* (1953), 263 Wis.

467, 472, 57 N. W. (2d) 706; *George J. Meyer Mfg. Co. v. Howard B. & C. Co.* (1945), 246 Wis. 558, 574, 18 N. W. (2d) 468; and *Crolius v. Lorge* (1927), 192 Wis. 130, 136, 212 N. W. 253.

We have no hesitancy in concluding, upon the basis of the offered evidence as to the intent of the parties manifested in the negotiations leading up to the execution of the contract, and as to the subsequent practical interpretation of the contract by the parties, that the contract phrase, *"computed as though the employer were a corporation and subject to income taxation as such,"* is applicable to the deductions to be made from gross income in order to determine net income as well as to the computation of the hypothetical income taxes to be deducted. Because the learned trial court erroneously refused to receive such offered testimony, it became unnecessary for the plaintiff to adduce any evidence in support of his claim stated in the bill of particulars, that an excessive amount was deducted by defendants in their operating statements for the salary of Robert H. Karatz. The plaintiff should be afforded an opportunity to present evidence on this issue if his counsel requests the same in the further proceedings to be had in the trial court as a result of our reversal of the judgment and the remanding of the cause for further proceedings.

We turn now to the issue of the rate of depreciation to be used in computing the depreciation to be deducted as an operating expense from gross income in order to compute the net income in which plaintiff was given the right to share as part of the compensation due him for services rendered under the contract. The partnership reported its net income for income-tax purposes on a fiscal-year basis, and it is conceded that the three fiscal years, as to which plaintiff was to share in the operating net income, are those ending, respectively, October 31, 1950, October 31, 1951, and October 31, 1952. The books of account of the partnership contained no itemized

breakdown of capital assets but every capital expenditure, other than for land and movables, such as motor vehicles and office furniture and fixtures, was lumped together under one of the following two headings: (1) "Theater equipment and improvements" or (2) "Projection equipment." The audit report of the partnership books for the fiscal year ending October 31, 1952, showed the cost of "Theater equipment and improvements" to be $86,620.30, and of "Projection equipment" to be $126,374.12.

The defendants, in their books of account for the three fiscal years in question, used a depreciation rate of 20 per cent in computing deductible depreciation on these two capital accounts, and the depreciation deducted in the operating statements supplied to the plaintiff was computed on the same basis. Sometime during the latter part of the summer or early fall of 1952 the federal internal revenue service audited the books of account of the partnership in connection with an audit of federal income-tax returns and disallowed the 20 per cent depreciation rate and in lieu thereof applied a 12½ per cent depreciation rate. Before adopting such 12½ per cent rate in its official reports of the audit, the internal revenue officer discussed the matter with one of the defendant partners and with the partnership accountant, and the defendants agreed to such 12½ per cent rate.

It is the plaintiff's contention that 6⅔ per cent is the correct applicable depreciation rate and the trial court so found. On the basis of a 20 per cent depreciation rate and the deduction of the full salary paid to Robert H. Karatz, the plaintiff would be entitled to no additional compensation based upon a sharing of net income. On the basis of a 12½ per cent depreciation rate there would be some additional compensation due plaintiff, but it would be greatly reduced from the amount found due by the trial court as a result of using a 6⅔ per cent depreciation rate and disallowing any deduction for the salary paid to Robert H. Karatz.

The reason which prompted the trial court to find that 6⅔ per cent was the required depreciation rate to be applied under the terms of the contract is stated in the memorandum decision of the learned trial judge as follows:

"Since the defendants did not keep a detailed depreciation account to demonstrate a higher rate, the record establishes only one method of computing a rate of depreciation which would be in compliance with the Federal Income Tax Laws for purposes of federal income taxes. This is the 6⅔% rate established by 'Bulletin F.' This is the rate which should be used in computing the deduction for depreciation in arriving at the amount of net income in which the plaintiff is entitled to share."

Bulletin "F" referred to in the trial judge's memorandum decision was issued in a revised form by the internal revenue bureau in January, 1942, and the text of the same is to be found in 2 Standard Federal Tax Reporter (CCH 1956), pp. 21,165 to 21,224, secs. 1776 to 1777.396. This bulletin contains several pages of text, which cover a general discussion of depreciation and obsolescence from the standpoint of deductions from gross income for federal income-tax purposes, followed by specific depreciation tables applicable to various businesses. The depreciation table of Bulletin "F" applicable to theaters is found on page 21,224, sec. 1777.395, and states at the top, "Generally, theater equipment has an average life of fifteen years" and this is followed by a list of items of theater equipment, such as "curtains," "projectors," "sound equipment," etc., with the average life expressed in years set opposite each. A reading of this list of items discloses that it is more applicable to indoor rather than outdoor theaters. Under date of February 21, 1955, the internal revenue service issued Internal Revenue Bulletin No. 8, and page 53 of such bulletin is entitled, "Depreciation Policy and Bulletin 'F,' " and we quote therefrom as follows:

"Although Bulletin 'F' is out-of-date, it will be reprinted so that taxpayers may not be left without any guide. However, taxpayers are cautioned that *the periods of useful life shown in Bulletin 'F' are not mandatory, and were originally published solely as a guide to what might be considered reasonably normal periods of useful life.*" (Italics supplied.)

From the foregoing, it is apparent that the trial court's decision, that a depreciation rate of 6⅔ per cent based upon a life of fifteen years for the two classes of capital assets in question was mandatory under Bulletin "F," was grounded upon an erroneous conclusion of law and cannot stand.

There is absent from the record any evidence that the average life of these capital assets was fifteen years. Plaintiff called two accountants, McNally and Sievers, as expert witnesses. Sievers was widely experienced in accounting work for outdoor theaters, while McNally had had no experience in that field. Neither gave any testimony as to the average life of the defendants' theater and projection equipment and improvements, but testified that Bulletin "F" required a composite rate of depreciation of 6⅔ per cent. This was an erroneous legal conclusion on their part. The proper interpretation of Bulletin "F" presents a matter of law for the courts to decide and is not a proper subject for expert opinion.

Sievers further testified that in his accounting for outdoor theaters he had never used the composite method of computing depreciation but had broken the capital items down into separate categories. He estimated that, if he were to average out the individual depreciation rates he had used for specific items of outdoor-theater capital assets to arrive at a composite rate, such hypothetical composite rate would be 8 or 9 per cent, and that a composite rate of 12½ per cent would be too high. However, this witness also stated that he used a classified rate of 20 per cent in his work for projection equipment and one of 5 to 6⅔ per cent on building and ground improvements. If a rate of 5 per cent be applied

against the original cost of the partnership theater equipment and improvements of $86,620.30, and a rate of 20 per cent be applied against the original cost of the partnership projection equipment of $126,374.12, it can be seen at a glance that a composite rate obtained by the averaging of the two will be in excess of 12½ per cent.

Sievers further testified that, if the internal revenue service auditor had employed a composite rate of 12½ per cent, it was his opinion "that is a compromise settlement." Outside of this, and the fact that the defendants agreed to the 12½ per cent depreciation rate used in the government audit, there is no evidence that such 12½ per cent composite rate was the result of a compromise reached between the internal revenue service and the defendants. Nevertheless, the trial court rejected the 12½ per cent rate on the ground that it was arrived at as a result of a compromise. There is a presumption that public officers have properly discharged the duties of their office. 43 Am. Jur., Public Officers, p. 254, sec. 511; *Marshall Drainage Dist. v. Festge,* ante, p. 114, 74 N. W. (2d) 616; *State ex rel. Nelson v. Rock County* (1955), 271 Wis. 312, 316, 73 N. W. (2d) 564; *Bohn v. Sauk County* (1954), 268 Wis. 213, 219, 67 N. W. (2d) 288. We deem it proper to invoke such presumption in the instant case because it seems inconceivable that the internal revenue service would approve a composite depreciation rate that was materially excessive.

In the case of *West Coast Hollywood Theatres v. Commissioner* (1943), 1 TMC 512 (CCH), the tax court was concerned with the composite depreciation life of theater and office equipment of several indoor-movie theaters, and held that the evidence justified a composite life of eight years. This is the equivalent of a composite depreciation rate of 12½ per cent. In the instant case Sievers testified that the life of outdoor-theater equipment was about the same as that of indoor theaters, while defendants' auditor, Liss, testified

that it was less. The *West Coast Hollywood Theatres Case* is not cited because we consider it is controlling of the instant case, but merely to show that the tax court has approved a composite depreciation rate for indoor-theater equipment of 12½ per cent upon the evidence there presented.

The instant contract of employment provided for the deduction from gross income to arrive at the net income of such expenses and deductions (including depreciation) *"which would be allowable under the Federal Income Tax Laws."* We consider the best evidence of an allowable composite rate of depreciation for defendants' theater and projection equipment and improvements is that which the federal internal revenue service used in its audit, and we so hold. This is the rate which the trial court should apply in making the further computations that become necessary as a result of this court remanding the cause for further proceedings.

The third issue presented is whether any carrying forward of an operating loss in a prior fiscal year is permissible in computing the "net income" of a subsequent fiscal year, on which plaintiff's additional compensation for such latter fiscal year is to be based. We interpret the quoted paragraph of the contract setting forth the formula for computing such "net income" as requiring each fiscal year to be considered entirely separately and independently of any loss sustained in any other fiscal year.

Inasmuch as plaintiff technically breached the contract by taking five weeks of vacation instead of the permissible three during the winter season of 1952–1953 after the theaters had ceased operations for the year, defendants had the legal right to terminate the employment contract as of January 20, 1953. Restatement, 1 Contracts, p. 405, sec. 275, illustration 5. The defendants sustained no damage as a result of such breach because plaintiff had already performed all of the services required of him under the contract to be rendered

under the employment contract for the employment year ending March 19, 1953, and defendants had received the full benefit of plaintiff's services in producing the partnership net income earned in the fiscal year ending October 31, 1952. The trial court determined that plaintiff could not recover the fixed compensation of $75 per week for the period from January 20, 1953, to March 19, 1953, but that he was entitled to recover the full additional compensation based upon a share of the partnership net income earned in such fiscal year. We approve of the trial court's determination in such respect because if plaintiff were to be denied such additional compensation the defendants would be thereby unjustly enriched at the expense of the plaintiff. Such determination is in accord with Restatement, 2 Contracts, p. 623, sec. 357 (1), and 5 Williston, Contracts (rev. ed.), p. 4140 *et seq.*, secs. 1482, 1483. See also *Valentine v. Patrick Warren Construction Co.* (1953), 263 Wis. 143, 164, 165, 56 N. W. (2d) 860.

The contract of employment expressly provided that the additional compensation due plaintiff based upon a share of the partnership net income "shall be due and payable not later than seventy-five (75) days after the close of the fiscal year during which such income is earned." The trial court awarded the plaintiff interest on the amount of such additional compensation found due for each of the three fiscal years in question computed from the seventy-fifth day subsequent to the ending of the fiscal year. We consider that this was proper and in accord with the rule that this court laid down in *State v. Milwaukee* (1914), 158 Wis. 564, 574, 149 N. W. 579, as follows:

". . . where the time of payment is fixed by contract or by law and the amount to be paid is easily ascertainable and the duty to pay plain, no demand is necessary to start the running of interest, whether the claim be against an individual or a municipality."

The following statement in 47 C. J. S., Interest, p. 21, sec. 8 a, is in accord:

"It has been held in a number of cases that, where a definite contract exists for the payment of money at a fixed date, and there is a breach of such contract, the law raises an implied promise to pay interest on the sum due; an implication created, it has been said, because in such cases justice to the creditor cannot be done without it."

As a result of our determination that a depreciation rate of 12½ per cent is to be used in computing deductible depreciation on the partnership theater and projection equipment and improvements, plaintiff will be entitled to a share of the net income realized from defendants' sale of the Marinette theater. On the basis of the depreciation rate of 6⅔ per cent found by the trial court the defendants realized no net income from such sale. However, it is conceded that the use of a 12½ per cent depreciation rate will reduce the cost basis of such asset for income-tax purposes sufficiently to result in a net gain instead of a loss.

We also call to the attention of the trial court that, in computing the operating expenses to be deducted from gross income in arriving at the partnership net income in which plaintiff is to share, not only must there be included plaintiff's fixed salary but also the additional compensation found due under the profit-sharing formula.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings not inconsistent with this opinion.