MILWAUKEE COLD STORAGE COMPANY, Appellant, vs. YORK CORPORATION and others, Respondents.

*December 6, 1957—January 7, 1958.*

For the appellant there was a brief by *Dougherty, Arnold, Philipp & Murray,* attorneys, and *James T. Murray* of counsel, all of Milwaukee, and oral argument by *James T. Murray.*

For the respondents there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *Norman C. Skogstad* and *Harry F. Franke* of counsel, all of Milwaukee, and oral argument by *Mr. Norman C. Skogstad* and *Mr. Franke.*

STEINLE, J.   It appears from the evidence that in the latter part of 1954 William R. Wendt, Jr., a sales engineer representing the defendant York Corporation contacted

David Stearns, president of the plaintiff, Milwaukee Cold Storage Company, with a view of interesting the plaintiff in a proposal for the modification of one of the plaintiff's refrigerating systems. On November 18, 1954, the defendant corporation entered into a written contract with the plaintiff for the installation of a new brine cooler to be located in a room adjacent to the main engine room which was situated on the first floor of the plaintiff's five-story warehouse building. Previous thereto, but after Mr. Wendt had contacted Mr. Stearns as above noted, the defendant corporation proposed in writing two other plans for modification of the plaintiff's refrigeration system. However, such proposals had not been accepted by the plaintiff. The contract of November 18, 1954, explicitly expressed the terms relating to machinery, materials, and labor to be furnished by the defendant corporation. The contract indicates that much of the work in connection with the installation of the brine cooler was to be done by the plaintiff's employees. Previously thereto at times the defendant corporation provided maintenance service for the plaintiff's refrigeration system. However, the plaintiff also employed a staff of "round-the-clock" engineers and skilled maintenance men who serviced the plaintiff's system. The plaintiff kept up a toolroom for use by its maintenance employees. The contract *inter alia* expressly provided that: "This contract contains all agreements between the parties and there is no agreement, verbal or otherwise, which is not set down herein. No person shall have any right to waive or change any provisions of this contract or to waive any legal right of the contractor without written authority from one of the contractor's duly authorized representatives."

The brine cooler, which was the subject of the contract, was completely installed by the defendant corporation and put into operation on June 24, 1955. On July 30, 1955, an ammonia leak occurred on the fifth floor of the plaintiff's

warehouse. The plaintiff contacted the defendant corporation and requested that it send its workmen to repair the leak. When the repairmen arrived, they found the ammonia fumes so strong that they were not able to enter the fifth floor without the aid of gas masks. After putting on such equipment, the workmen entered the fifth floor and found that an oil drain-pipe leading from an evaporator had ruptured, and that live ammonia was escaping from the break in the pipe which caused the fumes in the storage compartment of that floor. The workmen shut off the pipe in which the leak occurred. Events thereafter are detailed in the testimony of the defendant, Joseph Misheski, as follows (abridged):

"When we entered the room the second time we discovered a leak in the oil line. When we saw the leak we opened the suction valve and made sure that the liquid valve was closed. Then we went down to the engine room to pump down the system. We only pumped down the evaporator that was leaking. We did not pump down the second evaporator. After the system had been pumped down we returned to the fifth floor and then Albert Van Valkenberg and I cut the liquid-ammonia line which runs into the evaporator. We cut it at a point just below the expansion valve. After cutting the line, we put a cap or a plug, I don't recall which, on the line just below the expansion valve, so that nothing could come out of that end of the line. The other end of the pipe which ran into the evaporator itself was left open. We did not put a plug or cap on that line. After completing this work we waited a little further to see if we could detect any further ammonia leak, but by that time the ammonia smell was practically dissipated.

"When we arrived in the evaporator room the expansion valve was open. This expansion valve was attached to the live-ammonia line. It was the ammonia line which came from the engine room, and the live ammonia went into the evaporator below the expansion valve. When making the repairs I did not notice whether there was any oil in the evaporator, nor did I turn the valve to see if there was any oil left in the evaporator."

The defendant Albert Van Valkenberg testified as follows (abridged):

"Our chief concern was stopping the leak as quickly as possible, and in order to do this we had to pump down the ammonia from the brine shell that was leaking. In order to do this we closed the valves on the various floors that were being used so as not to pump the ammonia from these lines. Then we opened the suction valve on the brine line that was leaking. We closed the liquid valve that fed the brine shell that was leaking. We started both compressors, and then pumped the ammonia from the shell that was leaking. In pumping the ammonia down, we pumped it only from the shell that was leaking and not from the other shell. When we felt sure in our own mind that there was no more liquid ammonia in the shell, we returned to the fifth floor and cut the pipe that was leaking just below the expansion valve, and put a plug on one end of the pipe. After we had plugged the pipe there was a faint smell of ammonia but we could not detect any fumes coming out of the open line.

"When we arrived at the cold-storage plant we had received no instructions other than a request to correct the leak. Before leaving the cold-storage plant we talked to the operating engineer, told him what we had done, and asked him to call us in case of any emergency. We decided that we would make certain that the expansion valve was closed and that we would open up the suction line and remove the ammonia from the evaporator. After removing the ammonia, we decided to put both valves in a closed position and leave them that way until more-permanent repairs could be made."

Before leaving the plaintiff's premises after making the repairs as above indicated, the defendant employees instructed the plaintiff's engineer to contact them, day or night, if anything further was required. The defendant employees, however, were not called back to the plaintiff's plant. A few hours after the defendant employees left the plaintiff's premises, it was observed that ammonia was again escaping from the fifth floor. Douglas Robbins, an employee of the plaintiff, attempted to correct that leak. Because the flow of am-

monia was very heavy, it was necessary for him to don a gas mask before entering the fifth floor. Upon entering the fifth floor evaporator room, he found that the open uncapped ammonia pipe, which had been cut by the defendant employees, was blowing out ammonia. He peened the uncapped pipe in order to stop the flow of ammonia gas which was very strong. Later the peened pipe was welded shut.

The evidence also indicates that at the time of the ammonia leak, a large quantity of nuts and other perishable foods were stored on the fifth floor of the plaintiff's warehouse. These foodstuffs were damaged by the ammonia fumes.

Specifically and with reference to the first cause of action in the complaint, the plaintiff alleged that the defendants had agreed to do whatever work was necessary with respect to all the piping of ammonia in connection with the installation of the refrigeration system in the plaintiff's plant. With respect to said cause of action it was also asserted that in the performance of their work under the proposal, the defendant corporation and the defendant Harvey Kuhlman failed to make proper provision for preventing the circulation of ammonia to the brine cooler on the fifth floor of plaintiff's plant, and that the leak of July 30, 1955, resulted from the failure in such regard. With respect to the second cause of action the plaintiff alleged negligence on the part of the defendant corporation in that it had failed to make proper provision for preventing the circulation of ammonia to the brine cooler on the fifth floor, and further in that the defendant corporation and the other defendants as its employees had cut the ammonia line and had left its cut end open so as to permit ammonia to escape and to damage the foodstuffs.

By their answer the defendants specifically denied that there had been any agreement between the parties to do whatever work was necessary in connection with the installation of the refrigeration system in the plaintiff's plant. They denied that they failed to perform any of the work required

under the terms of the contract and alleged that pursuant to the contract they were not obligated or permitted to make provision for preventing the circulation of ammonia to plaintiff's brine cooler on the fifth floor. They denied that the leak which developed on July 30, 1955, resulted from any failure on their part. Upon this appeal the plaintiff contends, as it also did at the trial, that at and before the time that it entered into the written agreement it intended to install a new refrigeration system because of difficulties being experienced with the old unit; that prior to the signing of the contract the old evaporators on the fifth floor of the building housed the ammonia which was then fed through a series of pipes to the remaining four floors of the building; that as a safety precaution it was suggested by defendant corporation's sales engineer, Wendt, that the ammonia be housed on the first floor and that the old evaporators or brine containers on the fifth floor of the building be disconnected since they would serve no other function in the refrigeration system; that such was the intention of the parties at the time that the suggested change-over was proposed by Mr. Wendt and that such was the purpose for entering into the contract; that nowhere in the contract is such a purpose shown and nowhere in the terms of the contract is there reference to the elimination or deactivation of the evaporators on the fifth floor.

At the trial the court refused to permit William R. Wendt, Jr., the defendant corporation's sales engineer, when a witness, to answer questions relating to the following considerations: (1) Whether in working out his plans for the plaintiff it was the witness' object to install a new brine cooler to take the place of the evaporators on the fifth floor; (2) whether his plans provided for the disconnection of the evaporators on the fifth floor; (3) whether he knew that the cooler on the fifth floor would not longer perform any cooling function after the new equipment was installed on

the first floor; (4) whether there was discussion between the witness and the plaintiff's representative that the evaporators on the fifth floor were not functioning properly because of their age, and that a new system would be more efficient if those units were discontinued; (5) as to discussions the witness had with plaintiff's president concerning the evaporators on the fifth floor before submitting the contract proposal; (6) whether the witness and plaintiff's president reviewed the contract item by item before it was signed; (7) whether the new system as installed required that all ammonia be retained on the first floor as a safety factor so that there would be no ammonia on the floors above; (8) whether the witness emphasized such safety factor to plaintiff's president when inducing him to buy the new equipment; (9) whether there had been discussion between the witness and plaintiff's president concerning oil in the evaporators on the fifth floor.

During the course of the examination of David Stearns, the plaintiff's president, the court (1) refused to allow plaintiff's counsel to inquire as to conversations between such witness and Mr. Wendt as to what was to happen to the evaporators on the fifth floor; (2) refused to allow Mr. Stearns to testify as to conversations with Mr. Kuhlman relating to the evaporators on the fifth floor; (3) refused to allow the witness to testify as to conversations had with Mr. Kuhlman with respect to the maintenance of the evaporators which later leaked; (4) refused to allow the witness to testify that after the contract was signed, Mr. Kuhlman told the witness that under no circumstances was any representative of the plaintiff company to do anything with respect to the oil drain valve on the evaporators on the fifth floor, and that if any such work was to be done Mr. Kuhlman would take care of it; (5) refused to allow the witness to testify that Mr. Wendt stated that it was his intention that the defendant corporation would put in a valve or cut off

the live-ammonia lines to the evaporators on the fifth floor or in the alternative to have the defendant corporation advise the plaintiff to cut the ammonia lines or put in a valve so that the evaporators on the fifth floor would not operate under any pressure.

The trial court held that parol evidence relating to such considerations was not permissible because the written contract between the parties was not ambiguous and that it was an integration of the entire transaction. It determined further that under the terms of the contract there was no obligation on the part of the defendant corporation to confine the ammonia to the first floor. Specifically the trial court stated that:

"The contract is explicit in what the defendant York was to do, and when I address myself to the question of whether they did anything in violation of their contract, I cannot find it on the record that is before us today. As Mr. Skogstad has contended, there was no responsibility on the part of York to design a refrigeration system, and it was not responsible to confine the ammonia to the first floor. There was, on the other hand, a contract to do the things set forth in Exhibit 3 [the written contract], and I think the evidence supports the proposition that the defendant York has done that and done it without negligence. Mr. Arnold has very ably contended that there was not only a defect in design but a failure to cut off the ammonia line, a failure to close the suction valve, and negligence in connection with the expansion valve. I do not find the responsibility to do these things in the contract. I appreciate that it is conceivable that there might be negligence as to other parts of the premises by the York Corporation in installing the limited work that it was required to do under the contract, but that has simply not been proved. It has not been proved on this record. I could not let a jury finding stand which would find that the York Corporation, in installing the brine shell and connecting it up and cutting in the ammonia line, was obliged to or negligently did any of the other acts which Mr. Arnold has alluded to."

The following questions are presented on this appeal: (1) Did the writing constitute a complete and unambiguous contract so as to preclude parol evidence? (2) Were the oral promises of the defendant corporation admissible into evidence under the allegations of negligence in the plaintiff's complaint? and (3) Were the defendant employees negligent as a matter of law in the performance of repairs dealing with a dangerous instrumentality?

With respect to the first of these questions, it appears that the trial court was satisfied that the terms of the written contract were plain and clear; that the parties mutually assented to the writing as the complete and accurate expression of the terms of their agreement; that hence it was not proper to admit parol evidence to show antecedent understandings relative to matters not referred to in the writing.

It appears from the record that the terms "brine cooler" and "evaporators" are interchangeable. The contract provides only for the installation of a new brine cooler in a room adjacent to the engine room. The testimony indicates that the engine room is on the first floor. The contract also provides that the defendant corporation was to furnish "necessary brine mains and valves to connect new brine cooler and two new brine pumps to purchaser's brine mains within 10 feet of new brine pumps." The contract makes no mention of the evaporators on the fifth floor. There is no provision for the disconnection of the live-ammonia line leading into the evaporators on the fifth floor, nor is there any mention of installing a safety or shutoff valve on the line leading into the old evaporators. The portions of the examination of the witnesses Wendt and Stearns as referred to above and which were barred by the court, alluded to considerations, viz., that the parties recognized that the old cooling system was not safe, and that in connection with the installation of the new equipment a valve would be installed to shut off the ammonia lines leading to the old evaporators, or that

there would be a disconnection of the ammonia lines from the rest of the premises to the fifth-floor evaporators.

It was the court's duty to determine whether the writing was a complete and correct integration of the terms on which the parties agreed. The mere fact that the complaint set forth allegations to the effect that the defendant corporation had agreed to do work other than that specified in the contract, did not oblige the reception of the evidence proffered by the plaintiff with respect thereto merely because of the absence in the writing of any reference to such additional work. It is elementary that prior or contemporaneous promises not embodied in a written contract are deemed to have been abandoned, unless it appears that the parties did not intend that the writing should express the whole contract. *John O'Brien Lumber Co. v. Wilkinson* (1903), 117 Wis. 468, 94 N. W. 337, and *Danielson v. Bank of Scandinavia* (1930), 201 Wis. 392, 230 N. W. 83. In the case at bar there is ample evidence justifying the court's determination that the writing expressed the complete agreement. The evidence relating to the rejection by the plaintiff of the defendant corporation's first two written proposals; the fact that the plaintiff's president, David Stearns, was not only well experienced in matters pertaining to his industry but to the plant as well, besides being a graduate lawyer who would thoroughly understand the significance of the statement in the contract that the writing embraced all terms; the fact that plaintiff's own employees were to do considerable of the work in connection with the installation of the brine cooler on the first floor, were all competent and adequate supporting bases for the court's determination.

The trial court was satisfied and we concur in the view that the contract plainly and clearly indicates the specific work and material that was to be furnished by the defendant corporation. The court having determined that both parties had assented to the writing as the complete agreement be-

tween them, the evidence offered by the plaintiff with respect to evaporators on the fifth floor and the closing of ammonia lines leading thereto, was immaterial. Such evidence would clearly have varied or contradicted the terms agreed upon. In view of the finding that the contract was complete and unambiguous, the court properly refused to admit parol evidence concerning the matters which above have been held to be immaterial. Nothing in this opinion is intended to modify the holding in *Georgiades v. Glickman* (1956), 272 Wis. 257, 75 N. W. (2d) 573. That case laid down the rule that, in determining whether there is an ambiguity in a written contract which will render parol testimony admissible to resolve the same, a court should not merely look at the instrument alone but should examine its wording in the light of the offered parol testimony.

With reference to the second question presented, it appears that the claimed negligence referred to acts on the part of the defendant corporation which are outside the terms of the written contract. While it is, of course, recognized as pointed out in *Colton v. Foulkes* (1951), 259 Wis. 142, 47 N. W. (2d) 901, that accompanying every contract there is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and that a negligent failure to observe any of such conditions is a tort as well as a breach of contract, nevertheless, in the instant case there is no evidence to indicate negligence on the part of the defendant corporation in the construction of the brine cooler on the first floor, which undertaking, as heretofore determined, was the only responsibility of the defendant corporation under the contract. A careful analysis of the evidence satisfies us that the court correctly determined that the plaintiff's proof did not establish negligence on the part of the defendant corporation with reference to the defendant employees' work in connection with its obligation under the written contract.

With reference to the third question presented for our determination, it appears without dispute that before the defendant workmen left the job, there were no fumes of ammonia emanating from the open line. Instructions were given by the defendant employees to the plaintiff's engineers to contact them, day or night, in the event that anything further was required. The defendant employees were not called back. Manifestly the jury considered that the repair job was to be temporary rather than permanent, and there is testimony to sustain such view.

The plaintiff presented evidence to the effect that ammonia fumes were emitted from the cut end of the pipe which had not been blocked off by the defendant workmen. It is the position of the plaintiff that the failure of the defendant workmen to have closed that portion of the pipe constituted negligence as a matter of law in view of the dangerous agency involved. The jury found that the defendant workmen were not negligent with respect to the manner in which they repaired the conditions which they were called upon to correct at plaintiff's premises. It found also that no damage resulted from the escape of ammonia after the repairs were made by the defendant employees. In our opinion these considerations were clearly for the jury. While we are of the view that the court could not properly under the evidence determine as a matter of law that the defendant workmen were negligent with respect to the work which they had undertaken in the repair of the leak,—nevertheless, were it to be held that negligence existed as a matter of law,—no recovery for damages could be had by the plaintiff in view of the jury's finding that all of the damage to the foodstuffs, etc., had occurred before the defendant workmen left the premises.

We find no prejudicial error of record.

*By the Court.*—Judgment affirmed.