NEW ENGLAND STRUCTURES, INC. *vs.* RONALD R. LORANGER
& others
(and a companion case).

Suffolk.    February 8, 1968. — March 11, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Contract*, Building contract, Performance and breach, Termination. *Estoppel. Law or Fact.*

Where a building subcontract provided that on certain grounds of fault of the subcontractor the general contractor, after notice to the subcontractor, might terminate the subcontractor's right to proceed with the subcontract work, the general contractor, by giving the subcontractor a termination notice specifying one ground for termination, was not estopped subsequently to rely on other grounds unless the subcontractor proved that he had relied to his detriment on the fact that only one particular ground was asserted in the notice.   [66]

Whether a provision of a building subcontract requiring the general contractor to give a certain notice to the subcontractor of termination of the subcontractor's right to proceed with the subcontract work because of fault of the subcontractor was intended to afford the subcontractor an opportunity to cure the fault during the notice period was a question of law for the court.   [68]

In a building subcontract entitling the general contractor to terminate the subcontractor's right to proceed with the subcontract work because of fault of the subcontractor, a provision requiring the general contractor to give the subcontractor at least five days' notice of the termination was not intended to afford the subcontractor an opportunity to cure the fault specified in the notice during the notice period, but merely to give the subcontractor time to take such steps as might be necessitated by the termination.   [68]

TWO ACTIONS OF CONTRACT, the first by amendment from a suit in equity in the Superior Court on March 29, 1962; the second commenced by writ in the Superior Court dated October 4, 1962.

The actions were tried before *Rose*, J.

*Charles R. Desmarais* for Ronald R. Loranger & others.

*Warren G. Miller* for New England Structures, Inc.

CUTTER, J.   In one case the plaintiffs, doing business as Theodore Loranger & Sons (Loranger), the general contractor on a school project, seek to recover from New England Struc-

tures, Inc., a subcontractor (New England), damages caused by an alleged breach of the subcontract. Loranger avers that the breach made it necessary for Loranger at greater expense to engage another subcontractor to complete work on a roof deck. In a cross action, New England seeks to recover for breach of the subcontract by Loranger alleged to have taken place when Loranger terminated New England's right to proceed. The actions were consolidated for trial. A jury returned a verdict for New England in the action brought by Loranger, and a verdict for New England in the sum of $16,860.25 in the action brought by New England against Loranger. The cases are before us on Loranger's exceptions to the judge's charge.

Loranger, under date of July 11, 1961, entered into a subcontract with New England by which New England undertook to install a gypsum roof deck in a school, then being built by Loranger. New England began work on November 24, 1961. On December 18, 1961, New England received a telegram from Loranger which read, "Because of your . . . repeated refusal . . . or inability to provide enough properly skilled workmen to maintain satisfactory progress, we . . . terminate your right to proceed with work at the . . . school as of December 26, 1961, in accordance with Article . . . 5 of our contract. We intend to complete the work . . . with other forces and charge its costs and any additional damages resulting from your repeated delays to ·your account." New England replied, "Failure on your [Loranger's] part to provide . . . approved drawings is the cause of the delay." The telegram also referred to various allegedly inappropriate changes in instructions.

The pertinent portions of art. 5 of the subcontract are set out in the margin.[1] Article 5 stated grounds on which

---

[1] "The Subcontractor agrees to furnish sufficient labor, materials, tools and equipment to maintain its work in accordance with the progress of the general construction work by the General Contractor. Should the Subcontractor fail to keep up with . . . [such] progress . . . then he shall work overtime with no additional compensation, if directed to do so by the General Contractor. If the Subcontractor should be adjudged a bankrupt . . . or *if he should persistently . . . fail to supply enough properly skilled workmen . . .* or . . . disregard instructions of the General Contractor or fail to observe

Loranger might terminate New England's right to proceed with the subcontract.

There was conflicting evidence concerning (a) how New England had done certain work; (b) whether certain metal cross pieces (called bulb tees) had been properly "staggered" and whether joints had been welded on both sides by certified welders, as called for by the specifications; (c) whether New England had supplied an adequate number of certified welders on certain days; (d) whether and to what extent Loranger had waived certain specifications; and (e) whether New England had complied with good trade practices. The architect testified that on December 14, 1961, he had made certain complaints to New England's president. The work was completed by another company at a cost in excess of New England's bid. There was also testimony (1) that Loranger's job foreman told one of New England's welders "to do no work at the job site during the five day period following the date of Loranger's termination telegram," and (2) that, "if New England had been permitted to continue its work, it could have completed the entire subcontract . . . within five days following the date of the termination telegram."

The trial judge ruled, as matter of law, that Loranger, by its termination telegram, confined the justification for its notice of termination to New England's "repeated refusal . . . or inability to provide enough properly skilled workmen to maintain satisfactory progress." He then gave the following instructions: "If you should find that New England . . . did not furnish a sufficient number of men to perform the required work under the contract within a reasonable time . . . then you would be warranted in finding that Loranger was justified in terminating its contract; and it may recover in its suit against New England . . . . [T]he

or perform the provisions of the Contract, then the General Contractor may, by *at least five . . . days prior written notice to the Subcontractor* without prejudice to any other rights or remedies, *terminate the Subcontractor's right to proceed with the work.* In such event, the General Contractor may . . . prosecute the work to completion . . . and the Subcontractor shall be liable to the General Contractor for any excess cost occasioned . . . thereby . . ." (emphasis supplied).

termination . . . cannot, as . . . matter of law, be justified for any . . . reason not stated in the telegram of December 18 . . . including failure to stagger the joints of the bulb tees or failure to weld properly . . . or any other reason, unless you find that inherent in the reasons stated in the telegram, namely, failure to provide enough skilled workmen to maintain satisfactory progress, are these aspects. Nevertheless, these allegations by Loranger of deficiency of work on the part of New England Structures may be considered by you, if you find that Loranger was justified in terminating the contract for the reason enumerated in the telegram. You may consider it or them as an element of damages sustained by Loranger . . . ."[2]   Counsel for Loranger claimed exceptions to the portion of the judge's charge quoted above in the body of this opinion.[3]

1. Some authority supports the judge's ruling, in effect, that Loranger, having specified in its telegram one ground for termination of the subcontract, cannot rely in litigation upon other grounds, except to the extent that the other grounds may directly affect the first ground asserted. See *Railway Co.* v. *McCarthy*, 96 U. S. 258, 267–268 ("Where a party gives a reason for his conduct and decision touching . . . a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon . . . a different consideration. He is not permitted thus to mend his hold. He is *estopped* from doing it by a settled principle of law" [emphasis supplied]); *Luckenbach S.S. Co. Inc.* v. *W. R. Grace & Co. Inc.* 267 Fed. 676, 679 (4th Cir.); *Chevrolet*

---

[2] The judge also instructed, "[I]f you find that on the day following the sending of this telegram . . . employees of New England . . . were refused permission to continue that work, then you may consider that as a breach of the contract by Loranger, for Loranger's telegram terminated the contract . . . as of December 26th, [by] the giving of five days notice. . . . [I]f you find that [employees of] New England . . . reported for work and were only informed that they were to call their office and were not prevented from working then . . . you would be warranted in finding that this was not a refusal on the part of Loranger to permit them to work for the period between the receipt of the telegram and the date of the termination, December 26th."

[3] No exception appears to have been claimed to the portion of the charge (see fn. 2) relating to whether Loranger prevented New England from performing work on the subcontract during the period from December 19 to December 26.

*Motor Co.* v. *Gladding,* 42 F. 2d 440 (4th Cir.), cert. den. 282 U. S. 872. See also *Rode & Brand* v. *Kamm Games,* 181 F. 2d 584, 587 (2d Cir.); *Cummings* v. *Connecticut Gen. Life Ins. Co.* 102 Vt. 351, 359–362. In each of these cases, there is reference to estoppel or "waiver" as the legal ground behind the principle.

Our cases somewhat more definitely require reliance or change of position based upon the assertion of the particular reason or defence before treating a person, giving one reason for his action, as estopped later to give a different reason. See *Bates* v. *Cashman,* 230 Mass. 167, 168–169. There it was said, "The defendant is not prevented from setting up this defence. Although he wrote respecting other reasons for declining to perform the contract, he expressly reserved different grounds for his refusal.[4] While of course one cannot fail in good faith in presenting his reasons as to his conduct touching a controversy, he is not prevented from relying upon one good defence among others urged simply because he has not always put it forward, when it does not appear that he has acted dishonestly or that the other party has been misled to his harm, or that he is estopped on any other ground." See *Brown* v. *Henry,* 172 Mass. 559, 567; *St. John Bros. Co.* v. *Falkson,* 237 Mass. 399, 402–403; *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 150; *Sheehan* v. *Commercial Travelers Mut. Acc. Assn. of America,* 283 Mass. 543, 551–553; Restatement: Contracts, § 304; Williston, Contracts (3d ed.) § 742 (and also §§ 678, 679, 691; Corbin, Contracts, §§ 762, 1218, 1266 (and also §§ 265, 721, 727, 744, 756). See also *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 376.

We think Loranger is not barred from asserting grounds not mentioned in its telegram unless New England establishes that, in some manner, it relied to its detriment upon the circumstance that only one ground was so asserted. Even

---

[4] The original papers show (record, p. 22) that the reservation was, "The statement of the foregoing [reason] is not to be taken as waiving any other reason for . . . Cashman's refusal to proceed further with the agreement." This distinction from the present case, in our opinion, does not affect the principle that any estoppel to assert a different reason must rest on actual reliance.

if some evidence tended to show such reliance, the jury did not have to believe this evidence.  They should have received instructions that they might consider grounds for termination of the subcontract and defences to New England's claim (that Loranger by the telegram had committed a breach of the subcontract), other than the ground raised in the telegram, unless they found as a fact that New England had relied to its detriment upon the fact that only one particular ground for termination was mentioned in the telegram.

2. As there must be a new trial, we consider whether art. 5 of the subcontract (fn. 1) afforded New England any right during the five-day notice period to attempt to cure its default, and, in doing so, to rely on the particular ground stated in the telegram.  Some evidence summarized above may suggest that such an attempt was made.  Article 5 required Loranger to give "at least five . . . days prior written notice to the Subcontractor" of termination.

If a longer notice period had been specified, one might perhaps infer that the notice period was designed to give New England an opportunity to cure its defaults.  An English text writer (Hudson's, Building and Engineering Contracts, 9th ed. p. 530) says, "Where a previous warning notice of specified duration is expressly required by the contract before . . . termination [in case of dissatisfaction], the notice should be explicit as to the grounds of dissatisfaction, so that during the time mentioned in the notice the builder may have the opportunity of removing the cause of objection. . . ."  This view was taken of a three-day notice provision in *Valentine* v. *Patrick Warren Constr. Co.* 263 Wis. 143, 164, without, however, very full consideration of the provision's purpose.  In Corbin, Contracts, § 1266, p. 66, it is said of a reserved power to terminate a contract, "If a period of notice is required, the contract remains in force and must continue to be performed according to its terms during the specified period after receipt of the notice of termination."  See *Simons* v. *American Dry Ginger Ale Co. Inc.* 335 Mass. 521, 524–525.

Whether the short five-day notice period was intended to give New England an opportunity to cure any specified breach requires interpretation (see *Valentine* v. *Patrick Warren Constr. Co.* 263 Wis. 143, 155) of art. 5,[5] a matter of law for the court. See *Charles L. Hazelton & Son, Inc.* v. *Teel,* 349 Mass. 617, 621. It would have been natural for the parties to have provided expressly that a default might be cured within the five-day period if that had been the purpose. See e.g. *Mad River Lumber Sales, Inc.* v. *Willburn,* 205 Cal. App. 2d 321, 322, 325 (contract specifically gave period in which to cure default).[6]

Strong practical considerations support the view that as short a notice period as five days in connection with terminating a substantial building contract cannot be intended to afford opportunity to cure defaults major enough (even under art. 5) to justify termination of a contract. Such a short period suggests that its purpose is at most to give the defaulting party time to lay off employees, remove equipment from the premises, cancel orders, and for similar matters.

Although the intention of the notice provision of art. 5 is obscure, we interpret it as giving New England no period in which to cure continuing defaults, but merely as directing that New England be told when it must quit the premises and as giving it an opportunity to take steps during the five-day period to protect itself from injury. Nothing in art. 5 suggests that a termination pursuant to its provisions was not to be effective in any event at the conclusion of the five-day period, even if New England should change its conduct.

If Loranger in fact was not justified by New England's conduct in giving the termination notice, it may have subjected itself to liability for breach of the subcontract. The

---

[5] Article 5 of this subcontract (which is part of a printed form of contract) appears to be based to some extent upon the American Institute of Architects, standard contract, Form A1, art. 22. See Parker and Adams, The A.I.A. Standard Contract Forms and the Law. The purpose of the notice period under this A.I.A. form is not clarified by any commentary.

[6] Somewhat analogous provisions sometimes appear in real estate purchase agreements, expressly giving a vendor an extension of time for performance in order to cure title defects. See Swaim, Crocker's Notes on Common Forms (7th ed.) § 814, p. 435, § 852.

reason stated in the notice, however, for giving the notice cannot be advanced as the basis of any reliance by New England in action taken by it to cure defaults. After the receipt of the notice, as we interpret art. 5, New England had no further opportunity to cure defaults.

*Exceptions sustained.*