# United States Court of Appeals
## For the First Circuit

No. 99-2035
No. 99-2197

PRINCIPAL MUTUAL LIFE INSURANCE COMPANY,

Plaintiff, Appellant/Cross-Appellee,

v.

RACAL-DATACOM, INC.,

Defendant, Appellee/Cross-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Boudin, Circuit Judge,

Bownes, Senior Circuit Judge,

and Lynch, Circuit Judge.

Leonard H. Freiman with whom Paul M. Cimino and Goulston & Storrs, P.C. were on brief for plaintiff.
Matthew A. Porter with whom Timothy C. Blank and Dechert Price & Rhoads were on brief for defendant.

November 22, 2000

BOUDIN, Circuit Judge. This difficult case presents the question whether the landlord or the tenant should bear the cost of replacing a failed heating, ventilation and air conditioning ("HVAC") system in a commercial building located in Boxborough, Massachusetts. The landlord is Principal Mutual Life Insurance Company, and the tenant is Racal-Datacom, Incorporated.[1] The building is a manufacturing and office building called Boxborough Technology Park Building I, which Principal's contractor had "built to suit" Racal. The present dispute involves two separate leases for the building.

On April 30, 1984, Principal and Racal executed the first lease (the "1984 Lease") to commence February 1, 1985, and to run for five years. The lease provided for a two-year period within which Principal was required to "repair or replace all faulty materials and workmanship . . . including all latent defects" timely identified by Racal. Otherwise--in terms more fully described below--the 1984 Lease obligated Racal to maintain the building (including its HVAC system), to keep and to surrender the premises "in good condition," and to pay

---

[1]Principal is the successor in interest to the building's initial owner and landlord, Botech I, L.P.; and Racal is the successor in interest to the original tenant, Interlan, Inc. For simplicity, we refer solely to Principal and Racal throughout.

Principal's taxes on the property. The lease also gave Racal an option to extend the lease for two successive five-year periods.

Racal moved into the building on February 1, 1985, and almost immediately began to encounter difficulties with the HVAC system. The problems included clogged and leaking pipes and unacceptably high pressure in the heat pumps. The causes appear to have been misdesign, poor construction, and faulty maintenance; the parties dispute just how much each of these causes contributed and who is responsible. What is agreed to is that during the 1984 Lease term, the HVAC system suffered a massive structural failure and that it was not in proper working order at the close of the term.

Despite these problems, and without explicitly addressing them, the parties executed a new five-year lease on January 25, 1989 (the "1989 Lease"), which began to run on February 1, 1990. Formally, this was a new lease rather than an extension of the 1984 Lease pursuant to its option provisions. However, the important terms of the 1984 Lease concerning Racal's upkeep and surrender obligations were retained, except that the new lease did not include the original's two-year warranty obligation of Principal. During the second five-year term, the HVAC system continued to present problems, forcing

-4-

Racal to replace approximately 20 percent of the system's piping.

After the 1989 Lease expired in 1995, Racal moved out and Principal conducted an engineering study of the HVAC system which revealed that damage was so severe that the system had to be replaced at a cost to Principal of over $700,000. On March 10, 1998, Principal sued Racal in Massachusetts state court for breach of contract on the 1989 Lease, claiming that Racal had failed to maintain the HVAC system and surrender the premises in good condition in 1995. Racal removed the case to federal district court on diversity grounds and counterclaimed under the 1984 and 1989 Leases on several theories relating to the failed HVAC system.

On motion by Racal for partial summary judgment, the district court ruled, on October 1, 1998, that the phrase "good condition" in the 1989 Lease meant "as good condition as it was at the commencement of the lease term, reasonable wear and tear excepted." Principal countered by amending its complaint to assert claims against Racal under the 1984 Lease. Racal responded with a new motion for partial summary judgment, asserting that a provision in the 1989 Lease waived all of Principal's and Racal's potential claims against one another under the 1984 Lease. The district court declined to make that

ruling on the bare language of the 1989 Lease, and the case proceeded to trial in June 1999.

At the close of the five-day trial to the court, the district judge made extensive findings from the bench. Most important to this appeal were two: first, that the 1989 Lease extinguished all claims based on the 1984 Lease; and, second, that because the HVAC system was "fatally injured" at the beginning of the 1989 Lease period, Racal had returned the premises in 1995 in the same condition as they were at the start and had not violated the maintenance or surrender provisions of the 1989 Lease. Principal now appeals, contending that it did not waive its claims under the 1984 Lease and that, in any event, it had a valid claim under the 1989 Lease.

Contract interpretation is often said to be "a question of law" for the trial judge and, accordingly, subject to de novo review by the appellate court. Commercial Union Ins. Co. v. Gilbane Bldg. Co., 992 F.2d 386, 388 (1st Cir. 1993). A pertinent qualification is that when the factfinder turns to extrinsic evidence to resolve disputes of fact relating to the construction of contract terms, those findings are subject to deference on review, United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995); in the case of a bench trial, such findings are reviewed only for clear error. Johnson v.

Watts Regulator Co., 63 F.3d 1129, 1138 (1st Cir. 1995); Fed. R. Civ. P. 52(a).

We start with Principal's assertion that, contrary to the district court's ruling, Principal retained whatever claims it had under the 1984 Lease, despite the 1989 Lease language that Racal says relinquishes such claims. That language (section 8.5) provides that:

> [o]ther than contemporaneous instruments executed and delivered of even date, if any, this Lease contains all of the agreements between Landlord and Tenant relating in any way to the premises and supersedes all prior agreements and dealings between them.

Racal, stressing the term "supersedes" and the double reference to "all," says that the language waives all claims under the 1984 Lease. Principal says that it is merely a "garden-variety contractual integration clause" designed to assure that the 1989 Lease alone (and no other prior side agreement) governs Racal's occupancy of the premises from February 1, 1990.[2]

_____

[2]A standard integration clause can easily be more narrowly framed, e.g., Kobayashi v. Orion Ventures, Inc., 678 N.E.2d 180, 184 & n.6 (Mass. App. Ct. 1997) ("This lease contains the entire and only agreement between the parties. . . ."); Lemelman, 26 Massachusetts Practice-UCC Forms Annotated 151-52 (1984) ("It is mutually understood and agreed that this writing is a final, complete and exclusive integration, setting out the entire intention of the parties. . . ."), but language somewhat akin to section 8.5 has sometimes been used for this purpose, e.g., Amerada Hess Corp. v. Garabedian, 617 N.E.2d 630, 634 (Mass. 1993) ("This lease merges and supersedes all prior negotiations, representations and agreements . . . .").

We think the bare language suggests one outcome but does not rule out the other.  Principal says that if this is so, it wins because Massachusetts law requires that a "waiver" of claims must be evidenced by "clear, decisive and unequivocal conduct."  Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 992 (1st Cir. 1988) (citing Glynn v. City of Gloucester, 401 N.E.2d 886, 892 (Mass. App. Ct. 1980)) (internal quotation marks omitted).  But Principal's reliance on Paterson-Leitch is misplaced:  the immediate issue is not "waiver by conduct" but construing contractual language that explicitly bars certain claims; the only question is which claims.

We agree with the district court that the quoted provision is ambiguous enough to permit the consideration of pertinent extrinsic evidence, see Den Norske Bank AS v. First Nat'l Bank, 75 F.3d 49, 52-53 (1st Cir. 1996), which the district court deemed to support Racal's interpretation.  In substance, the district court found that as they moved toward the new 1989 Lease, the parties were principally animated by a desire to get on with their relationship and "not to press claims that they may have had against one another" under the original lease.  Although Principal admits that such findings of fact are reviewed under the clearly erroneous standard, Uno v.

-8-

City of Holyoke, 72 F.3d 973, 978 (1st Cir. 1995), it says that there is no evidence whatever to support the district court's finding.

We have reviewed the record with some care and believe that it supports the following inference (but no more): that Principal, knowing that the HVAC system was causing problems for which Racal might be held liable, made no effort prior to the 1989 Lease to press such claims because it desired to maintain good relations with a tenant who was paying rent and likely to sign a new lease. To this extent the evidence adequately supports the district court's finding; but so read, the finding falls short of proving a subjective intent by the two parties to make the 1989 Lease a deliberate waiver of possible claims under the 1984 Lease.

Of course, imputing to the parties a general desire to let sleeping dogs lie does mean that wiping out claims under the 1984 Lease could have been a reasonable objective of the parties. See Restatement (Second) of Contracts § 202(a) (Supp. 1981); cf. New England Structures, Inc. v. Loranger, 234 N.E.2d 888, 892-93 (Mass. 1968). Still, there is no direct evidence that the parties adopted section 8.5 for this purpose; indeed, section 8.5 also appeared in the 1984 Lease, drafted at a time when there was no formal prior lease. The reality is that

parties often adopt contract language without having in mind all of the contexts to which it might be applied.  See Farnsworth, Contracts § 7.9, at 510 (2d ed. 1990).

Although the parties' full subjectively intended meaning of the provision is unclear, the literal language of section 8.5 is not.  Other considerations being inconclusive, it seems to us fair in this extremely close case to let matters turn on the literal language used by the parties even though a less literal reading is also quite plausible.  Here, section 8.5 literally read wipes out "all prior agreements" between the parties "relating to the premises"--and so covers the 1984 Lease, removing the bases for any claims for its breach. It is worth adding that Principal did not rely on the 1984 Lease when it first brought this case.

An alternative default rule--that uncertain language be construed against the drafter--is also invoked by Racal because Principal drafted the 1989 Lease.  But the doctrine has been described as one of "last resort" in Massachusetts, Aldrich v. Bay State Constr. Co., 72 N.E. 53, 54 (Mass. 1904), and it may be especially weak when the parties are sophisticated businesses, RCI Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 203 n.3 (1st Cir. 1987).  We find it unnecessary to rely upon the doctrine here.

Let us turn now to the equally difficult question whether the 1989 Lease imposed the HVAC loss on Principal or on Racal.  There are three directly pertinent and interrelated provisions, all of which are contained in section 5 of the 1989 Lease:

> **!** Section 5.1.2 required that Racal "maintain, repair, replace, clean" and secure all parts of the building including its HVAC system and ensure that the premises are "in compliance with all governmental requirements.";
>
> **!** Section 5.1.2 also required Racal to "keep[] the Premises in good condition, reasonable wear and damage by insured casualty and taking excepted"; and
>
> **!** Section 5.1.9 required that Racal "restor[e] the Premises to a fully functional and tenantable condition" and surrender the premises at the end of the lease term "in good condition, reasonable wear and damage . . . excepted."

Although Principal relies upon all of these provisions, the last is arguably the most helpful to it:  on a literal reading, an office building with a "fatally injured" HVAC system could fairly be said <u>not</u> to be in "good condition" and surely not in a "fully functional and tenantable condition."

The district court rejected this literal reading on the authority of several Massachusetts cases, most importantly, <u>Codman</u> v. <u>Hygrade Food Prods. Corp.</u>, 3 N.E.2d 759 (Mass. 1936).  <u>Accord Guarente</u> v. <u>Waldorf Sys., Inc.</u>, 167 N.E.2d 617 (Mass.

-11-

1960); <u>Kaplan</u> v. <u>Flynn</u>, 150 N.E. 872 (Mass. 1926). In these cases, the Massachusetts courts construed essentially similar language, requiring a tenant to return a premises in good condition, or in tenantable condition as meaning--in <u>Codman</u>'s words--"the actual condition of the building . . . existing when the term began . . . ." <u>Codman</u>, 3 N.E.2d at 761; <u>accord</u> <u>Guarente</u>, 167 N.E.2d at 620; <u>Kaplan</u>, 150 N.E. at 873.

Such construction is not the most literal interpretation of the words but it makes more practical sense than the literal reading. Certainly in a non-commercial rental of a house or an apartment, most tenants would be startled to discover that bland, "good condition" language meant that the tenants were responsible for defects on the premises that had arisen <u>prior</u> to the lease and which might not even be apparent or readily discoverable. Further, <u>Codman</u> itself applied this common sense limitation to a <u>commercial</u> lease, although it also recognized that the parties could choose to provide otherwise and require the tenant to remedy conditions from use of the building by earlier occupants. 3 N.E.2d at 761-62.

<u>Codman</u> went even further in Racal's direction by saying that the parties could contract out of the default position (<u>i.e.</u>, no liability for harm caused during earlier tenancies) "[b]y the use of clear and unmistakable language." 3 N.E.2d at

-12-

761-62. If this were the law of Massachusetts, Principal would necessarily lose. Taken as a whole, the language used in the 1989 Lease is more favorable to the landlord than the language in the earlier Massachusetts cases such as Codman; but given Codman's gloss on the concept of good or tenantable condition, the 1989 Lease does not contain any language that "clear[ly] and unmistakabl[y]" imposes liability on the tenant for defects that occurred before the lease term began.

We are loathe to decide the case on this basis. The "clear and unmistakable language" test, if test it was, appears in a decision now over a half century old and was not repeated in the Guarente decision rendered in 1960, see 167 N.E.2d at 618-20. Further, it is hard to see why in a complicated and thoroughly negotiated commercial transaction (like ours) the contract should not be given its best and most reasonable interpretation without any special obligation to be notably more clear on this point than on any other. What we take from Codman and its successors is that, unless the lease indicates otherwise, good or tenantable condition means "as of the start of the lease."

Does the 1989 Lease, as a whole, indicate otherwise? It is true that the lease shows, in the sum of its provisions, an intent to treat the tenant as pretty close to an owner during

the lease period. Although a tenant, Racal is explicitly responsible for upkeep, repairs and even the owner's taxes on the property. But such a tenant is at most a temporary owner during the lease period; the "owner" label tells us very little about the tenant's liability after the tenant's "ownership" has ceased for defects that arose before his "ownership began."

Similar uncertainty inheres in provisions in the 1989 Lease that gave the tenant the right to inspect before occupancy, treated occupancy as an "acknowledgment" that the premises were in satisfactory condition, and left to the tenant the cost of any further additions or improvements. Thus, Racal was properly responsible for repairing the system during occupancy if it wanted decent HVAC service. Yet all of these provisions could be taken to mean no more than that the tenant is not going to get any more work out of the landlord, nor be able to avoid the lease, because of preexisting defects.

In sum, nothing in the 1989 Lease decisively warrants a departure from the approach taken in Codman: Racal bears responsibility regardless of fault for any harm or defects in the HVAC system that occurred during the lease term; but Principal cannot recover for defects or failings that existed prior to the lease term. And, on this view, the district court's outcome must be sustained. The HVAC system may have

-14-

deteriorated further under Racal's second lease but, since the district court found that the system was essentially beyond repair at the start of that lease, replacement was necessary from the start and nothing that happened afterwards increased a loss that Principal must otherwise bear.

Affirmed.