Fabricant, Judith, J.
INTRODUCTION
This action arises from the termination of the plaintiffs employment as president of the defendant. The plaintiff alleges breach of contract, in that, among other defaults, the company terminated him without cause, and without providing him certain compensation due him under his employment agreement in the event of termination without cause. The company contends that it terminated the plaintiff for cause. Before the Court are cross motions for summary judgment, in which each side argues that an arbitration *278 award in a related dispute establishes facts entitling it to judgment as a matter of law. For the reasons that will be explained, the plaintiffs motion will be denied, and the defendant’s motion will be allowed in part and denied in part.
BACKGROUND
The record before the Court establishes the following facts as undisputed. The plaintiff, Luciano Manganella, is the founder of Jasmine Company, Inc., which operates a chain of women’s clothing stores. As of July 2005, he was the president and sole stockholder of the company. In July 2005, the plaintiff agreed to sell all his shares in the company to Lemer New York, Inc., for some thirty million dollars. In connection with the sale, the parties entered into a set of written contracts, all dated July 19, 2005, among which were an “Executive Employment Agreement” (the employment agreement) and a “Stock Purchase Agreement.” The stock purchase agreement provides for seven million dollars of the purchase price to be held in escrow for one year, with that amount to be returned to the purchaser in the event of a “Major Employment Breach.”[1] The agreement defines that term, at §6.16E, to include “the willful refusal of the Shareholder to comply with any significant, lawful and proper policy, directive or decision of the Company’s Board of Directors . . . only if not remedied within thirty days after receipt of written notice from the Company." The agreement provides for arbitration of any dispute as to whether a major employment breach has occurred. It sets forth procedures for arbitration, including that the arbitration panel “shall award attorneys fees and costs to the prevailing party” (§6.13(e)).
The employment agreement provides for Manganella to serve as president of the defendant for a period of three years after the sale, with specified compensation and benefits. Among his obligations, as specified in the agreement, is to “comply in all material respects with the Company’s code of ethics and business conduct policies and all other Company policies and procedures.” Section five of the agreement provides for termination of Manganella’s employment upon “the giving of notice of termination by the Company ... (A) for Cause or (B) for any other reason or for no reason (a termination described in this clause (iii)(B) being a termination by the Company ‘Without Cause.’ ” In the event of termination without cause, Manganella is entitled to his full compensation and benefits for the entire three-year period. In the event of termination for cause, he is entitled only to compensation accrued as of the date of termination.
Section 5(a) of the employment agreement defines “Cause,” to include:
(i) intentionally causing the Company to violate a material local state or federal law in any material respect; (ii) gross negligence or willful misconduct in the conduct or management of the Company not remedied within thirty days after receipt of written notice from the Company; (iii) willful refusal to comply with any significant, lawful and proper policy, directive or decision of the Board or the Chairman in furtherance of a legitimate business purpose . . . and only if not remedied within thirty days after receipt of written notice from the Company, [and] (iv) any willful or intentional act of Executive that has the effect of injuring the reputation or business of the Company or any of its Affiliates in any material respect.
The employment agreement does not provide for arbitration of disputes.
In May of 2006, some ten months after the stock sale, the company received a complaint from an employee alleging sexual harassment by Manganella. The company engaged an outside law firm to investigate the complaint, and placed Manganella on unpaid administrative leave during the investigation. The investigation included an interview with Manganella, as well as with the complaining employee and other employees. Neither the company nor the investigator provided Manganella or his counsel the specific details of the allegations against him during the investigation.
On June 22, 2006, the Company sent Manganella two letters, one terminating his employment, and the other asserting rights under the stock purchase agreement. The employment termination letter, on letterhead of Lerner’s parent, New York & Company, signed by Richard P. Crystal, identified as its Chairman, Chief Executive Officer, President and Director, states that “Your employment is being terminated effective today for cause, based on corroborated violations of the Code of Business Conduct.” The letter elaborates: “it has been determined that you engaged in behavior in direct violation of the Code of Business Conduct’s prohibition of harassment, its requirement to treat our associates professionally and with respect at all times, and its standards on the use of Company assets. The Code also requires us, as senior management, to lead by example, which you have failed to do.” The company did not pay Manganella any further compensation after the date of the termination letter.
The second letter of the same date, from Lerner’s counsel, informed Manganella that “there has been a Major Employment Breach as defined in Section 6.16 of the stock purchase agreement. .. Shareholder has, among other things, willfully refused to comply with certain significant, lawful and proper policies, directives and decisions of the Company’s Board of Directors and/or the Chief Executive Officer, including the Company’s code of business conduct policies.” The letter goes on to cite the code’s prohibition on sexual harassment, its requirement that employees report violations, and its requirement that senior management “lead by example.” It then describes Manganella’s conduct, as follows: “In direct violation of the Code of Business Conduct, Shareholder made unwelcome sexual advances, requests for sexual favors and other verbal, graphic or physical conduct of *279 a sexual nature (such as obscene or lewd jokes, comments or displays) to at least four current Jasmine employees and possibly two or more former Jasmine employees.” It goes on, “Shareholder’s conduct is entirely unacceptable, not subject to remedy, and constitutes a Major Employment Breach. Shareholder has also committed a Major Employment Breach by misusing company assets — namely using a company computer to download, store and view sexually graphic materials. Accordingly, purchaser is immediately entitled to the Shareholder Payment that is currently in the Escrow Account.” The letter requests that Manganella sign and return an enclosed funds transfer form by June 29, 2006, and closes with a reservation of all other rights and remedies.
Manganella did not sign and return the funds transfer form, and on June 29, 2006, Lerner filed a claim for arbitration, seeking a determination that it was entitled to the escrow funds based on a major employment breach by Manganella. Lerner also, on the same date, filed suit in the United States District Court for the District of Massachusetts, seeking an injunction against distribution of the escrow funds pending the arbitration. Named in that action were Manganella and Goulston & Storrs, the escrow agent under the stock purchase agreement.
The complaint in that case recited the sequence of events, including that its outside investigator had “concluded that Manganella had made unwelcome sexual advances and suggestive, lewd, or derogatory remarks to employees of Jasmine and that Manganella downloaded scores of sexually-graphic images onto Jasmine computers. This conduct violates the Code of Business Conduct” (¶2). The complaint set forth the provisions of the code of business conduct prohibiting harassment and misuse of company assets, and requiring executives to “lead by example.” It recited that the company had received a complaint from a former employee accusing Manganella of “making unwelcome sexual advances and suggestive, lewd or derogatory remarks, [ ] downloading and retaining pornography on his company computer, and [ ] threatening to punish her if she told anyone about his conduct.” The complaint went on to recite that the company had retained an outside firm to investigate, and that the investigator had “substantiated the allegations with corroborating evidence including testimony by first hand witnesses, previously unknown complaints and judicial proceedings against Manganella, records from Manganella’s company computer, and written records.” “Indeed,” the complaint alleged, “at least four associates of Jasmine volunteered detailed accounts of Manganella propositioning each of them to engage in sexual activity with him and made lewd and demeaning comments about their bodies” (¶27). The complaint alleged that “[biased on the evidence outlined above," the investigator had notified Lerner “that four current employees personally experienced unwanted sexual advances and other sexually-oriented conduct that was a pattern of behavior by Manganella, and, thus, that Mánganella had violated the Code of Business Conduct” (¶30). Based on that conduct, the complaint alleged, Lerner “terminated Manganella for cause on June 22, 2006" (9131). The federal court granted the requested preliminary injunction on July 12, 2006.
The arbitration proceeded through discovery, including depositions of Manganella and of women who alleged harassment by him. The three-member arbitration panel heard evidence over ten days in November and December of 2006. Four alleged victims testified to the details of the alleged sexual harassment. Nine other witnesses testified, including Manganella, his wife, Richard Crystal, the outside investigator, and experts for both sides on sexual harassment and related matters.[2] The arbitration panel heard closing arguments in a six-hour session on February 27, 2007, and issued its twenty-page decision on April 20, 2007.
The arbitrators’ award set forth the “principal issue” before the panel as “whether Mr. Manganella committed a major employment breach” as defined by the stock purchase agreement. Lerner, the panel recited, “asserts that Respondent sexually harassed four Jasmine employees; willfully refused to abide by the Code of Conduct, . . . and that the violation could not be remedied,” and that Manganella’s conduct was both a major employment breach under the stock purchase agreement and cause to terminate him under the employment agreement. Manganella’s position, the panel recited, was that “Lerner failed to establish a major employment breach as defined by the parties’ stock purchase agreement,” in that it had failed to establish both that he had willfully refused to comply with a company policy, and that he received written notice of the alleged refused and failed to remedy it after written notice. Further, the award recites, Manganella “disputes that he sexually harassed any of Jasmine’s women employees and states that he never received prior to his termination any notice of the specific allegations of misconduct by the women who testified,” and contends that Lerner “presented no evidence of futility under New York law with respect to notice and remedy.”[3]
The arbitrators found, as fact, that Manganella “was well acquainted with the Company’s policy on sexual harassment,” that he “did not comply with the policy,” and that “his refusal was willful” (p. 5). The arbitrators found “the merits of the allegations overwhelmingly established” (p. 12). Specifically, the arbitrators found, “he sexually propositioned several women employees and inappropriately touched and propositioned one of these employees,” that the victims did not complain earlier because he “had a strong personality and temper and a number of employees were reluctant to draw his ire, with some fearing *280 consequences if they brought a complaint,” and that “(t]his fear continued long after the sale of the business to Lerner” (p. 12). The arbitrators further found that the victims were “wounded” by Manganella’s treatment of them (p. 15).
The arbitrators went on to find, however, that Lerner had not given Manganella notice and an opportunity to remedy his violations,[4] and that its obligation to do so was not discharged on the ground of futility (p. 18). In reaching that conclusion, the panel considered Lerner’s contention that Manganella’s immediate removal was necessary to protect the company from further harm; on that point the panel observed that Manganella was on administrative leave from the time of the complaint until his termination, that the company could have kept him on administrative leave, and that the company “also could have terminated Respondent on other grounds, without resort to the major employment breach provision, and it could have terminated him even on that ground if he were provided with notice and remedy and an acceptable alternative were not found” (p. 18). Based on those findings, the panel ruled that Lerner had not proved a major employment breach as defined in the stock purchase agreement, and that Manganella was therefore entitled to the funds held in escrow, as well as “all [his] attorneys fees and costs of this arbitration” (p. 18). After written submissions, on June 9, 2007, the panel awarded Manganella two million dollars as attorneys fees and costs. The United States District Court for the Southern District of New York confirmed the arbitration award on August 8, 2007.
Manganella filed his verified complaint in this action on June 29, 2006, the same day that Lerner filed its federal court action and its arbitration claim. He filed an amended verified complaint on September 18, 2006. The amended complaint alleged that New York & Company breached his employment agreement by excluding him from management meetings, interfering with his decisions regarding growth of Jasmine, failing to provide promised “integration and infrastructure,” placing employees in Jasmine without his approval, depriving him of inventory and financial information, canceling his check-writing authority, and terminating him for claimed violation of the code of business conduct without notice and opportunity to remedy. Based on those allegations, the amended complaint sets forth counts of breach of contract (count I) and breach of the implied covenant of good faith and fair dealing (count II).
In the cross motions now before the Court, each side contends that the arbitrator’s award establishes all material facts, and compels resolution of liability on all claims in its favor. Manganella contends that the arbitrator’s award precludes Jasmine’s reliance on §5(a)(iii) of the employment agreement as cause for his termination; that its termination letter relies on that as the only cause; that it is now barred from invoking any other cause; and that therefore his termination was without cause, so that the company’s failure to pay him the compensation due upon termination without cause constitutes breach of the agreement. Jasmine contends, on the contrary, that the arbitrators’ award establishes that Manganella intentionally committed sexual harassment; that such conduct as a matter of law gives rise to cause for his termination under §§5(a)(i), and (iv) of the agreement; and that its notice of termination does not bar reliance on those provisions; based on that analysis, Jasmine contends that its termination of Manganella did not violate the agreement, and he is entitled to no relief.
DISCUSSION
1. Legal Standards
This Court grants summary judgment only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine dispute of material fact on every relevant issue “even if he would have no burden on an issue if the case were to go to trial.” Pederson v. Time, Inc., 404 Mass 14, 17 (1989).
On a motion for summary judgment, the moving party must demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the nonmoving party must respond and offer evidence of specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. See Pederson v. Time, Inc., supra at 17.
In this case both parties rely on issue preclusion, also known as collateral estoppel. “The doctrine of issue preclusion provides that when an issue has been ‘actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether on the same or different claim.’ ” Demoulas Super Markets, Inc. v. Ryan, 70 Mass.App.Ct. 259, 265-66 (2007), quoting Cousineau v. Laramee, 388 Mass. 859, 863 n.4 (1983). “The purpose of the doctrine is to ‘conserve judicial resources, to prevent the unnecessary costs associated with multiple litigation, and to ensure the finality of judgments.’ ” Alba v. Raytheon Co., 441 Mass. 836, 841 (2004), quoting Martin v. Ring, 401 Mass. 59, 61 (1987). To apply the doctrine, a Court must determine that “(1) there was a valid and final judgment on the *281 merits in the prior adjudication; (2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior litigation; (3) the issue in the prior adjudication is identical to the issue in the current litigation; and (4) the issue in the prior adjudication was essential to the earlier judgment.” Green v. Brookline, 53 Mass.App.Ct. 120, 123 (2003).
Here, the parties agree that the arbitrators’ award is a final judgment for purposes of issue preclusion, see Miles v. Aetna Cas. & Sur. Co., 412 Mass. 424, 427 (1992), and that the parties are identical for this purpose, in that Lerner and its subsidiary are in privity. See TLT Constr. Corp. v. A. Anthony Tappe & Assocs., Inc., 48 Mass.App.Ct. 1, 9 (1999); Cambridge Literary Properties, Ltd., v. W. Goebel Porzellanfabrink G.M.B.H. & Co., 448 F.Sup. 2d 244, 267 (D.Mass. 2006). They disagree as to what issues were actually and necessarily decided by the arbitrators, and how those issues bear on the issues presented here.
2. Available Causes for Termination
Perhaps most fundamentally, the parties disagree as to what cause or causes for termination are available for consideration. Put differently, they disagree as to the legal significance of the company’s characterization of Manganella’s conduct in the two letters of June 22, 2006, and in the arbitration proceeding, as in violation of its code of business conduct. That characterization, Manganella contends, binds the company now, and precludes it from relying on any cause for termination under the employment agreement other than that provided in section 5(a) (iii) of the agreement, which authorizes termination on that ground only if not remedied within thirty days after notice.
Manganella relies on Hammond v. T.J. Litle & Co., 82 F.3d 1166, 1176 (1st Cir. 1996). In Hammond, the plaintiff had received stock in the defendant corporation upon his employment as its chief financial officer. His contract provided that, in the event of termination for cause, he would be required to offer his stock for repurchase by the company, but he would have no such obligation in the event of termination without cause. The evidence at trial was that at the time of his termination, the plaintiff asked his superior “if it was because of his performance,” and the superior “replied that ‘it was not,’ ” but was rather because of “relationship issues” between him and the chairman of the company arising from a dispute over the number of shares to be issued to him. The company did not, at the time of the termination, characterize those “relationship issues” as cause under the contract, and a written notice of termination made no reference to cause, and did not demand that the plaintiff offer his shares for repurchase. Nor did the company offer him an opportunity to be heard regarding any claimed cause, as its by-laws required in the event of termination of an officer for cause.
In response to the plaintiffs suit, however, the company changed its position, asserting both that the plaintiff was terminated for deficiencies in performance, and that his relationship difficulties constituted cause for termination under the contract, so that he was obligated to offer his shares for repurchase. The company cited Klein v. President and Fellows of Harvard College, 25 MassApp.Ct. 204, 208-09 (1987). The Federal Court read that case as “stand(ing) for the proposition that, when an employee may only be terminated for cause, whether the employer so informs the employee plays a decisive role in a court’s later determination of whether the employee was discharged for cause.” 82 F.3d 1175. Applying that principle, the Court held that, having failed to tell the plaintiff that his termination was for cause, the company was barred from later seeking the benefits of a termination for cause. The Court stated that “where, as here, consequences flow from whether the termination was for cause, the employer’s stated reason is determinative, assuming it is not pretextual.” Id.
Manganella reads that statement as establishing a rule that the employer is bound by the precise language of its termination notice, particularly any reference to a specific cause or ground provided in the employment agreement. That reading takes the language of Hammond out of its context, and expands its scope beyond the reasoning of that decision. The issue in Hammond was whether the termination was for cause or not, in circumstances where contract-based consequences flowed from that distinction. The Court was not concerned with an employer’s identification of a particular cause, and did not purport to establish or recognize any rule on that subject.
Klein, 25 Mass.App.Ct. at 208-09, illustrates the difference. There the employer informed the employee directly of her misconduct, and then sent a letter notifying her of her termination, without specifying any reason. At trial, the employer contended that she was an at-will probationary employee, whom it was free to terminate without cause. The trial court found that the employee was not at will, but had a contractual right to employment for a fixed term, subject to termination only for cause. Since the termination letter had cited no cause, the trial judge concluded that the employer had breached the contract. The Appeals Court reversed, concluding that the misconduct of which the employer had informed the employee constituted cause for her discharge, and that the failure to cite it in the termination letter did not bar the employer from relying on that ground at trial, because “(t]he important point is that the plaintiff, notwithstanding the letter of dismissal, knew why her employment was terminated.” Id.
Also instructive here, although arising from a different factual context, is New England Structures, Inc. v. Loranger, 354 Mass. 62, 64-66 (1968). The contract there involved construction, not employment. The de *282 fendant general contractor terminated the plaintiffs subcontract, asserting by letter that the termination was “(b)ecause of your . . . repeated refusal ... or inability to provide enough properly skilled workmen to maintain satisfactory progress,” and citing a contract provision authorizing termination on that as well as other grounds. At trial, the general contractor offered evidence of the asserted deficiency as well as other deficiencies in the subcontractor’s performance. The trial judge instructed the jury that the general contractor was limited to the particular ground cited in its letter. The Supreme Judicial Court reversed, observing that “[o]ur cases . . . require reliance or change of position based upon the assertion of the particular reason or defense before treating a person, giving one reason for his action, as estopped later to give a different reason.” Id. at 66. On that basis, the Court concluded, the defendant would be barred from asserting grounds not mentioned in its notice only if the plaintiff “establishes that, in some manner, it relied to its detriment upon the circumstance that only one ground was so asserted.” Id.
Here, as in Klein, 25 Mass.App.Ct. at 208-09, there is no question that the plaintiff knew that he was terminated for cause, and knew what conduct was alleged to constitute cause. The termination letter expressly told him that he was terminated “for cause,” and that the conduct giving rise to cause involved “harassment,” as well as the failure “to treat our associates professionally and with respect” and “to lead by example.” The letter of the same date asserting a “Major Employment Breach by Shareholder” under the Stock Purchase Agreement elaborated on the specific behavior, informing the plaintiff that he had “made unwelcome sexual advances, requests for sexual favors and other verbal, graphic or physical conduct of a sexual nature (such as obscene or lewd jokes, comments or displays) to at least four current Jasmine employees and possibly to two or more former Jasmine employees,” and that he had also used a company computer to “download, store and view sexually-graphic materials.” If these letters had left any doubt, the federal court complaint filed one week later would have dispelled it, with its allegations that the company’s outside investigator had concluded that Manganella “had made unwelcome sexual advances and suggestive, lewd or derogatory remarks to employees . . . and ... downloaded scores of sexually-graphic images” onto a company computer (¶2), and that on that basis the company had terminated Manganella “for cause” (¶9).
As Manganella forcefully points out, the company’s letters, as well as its verified complaint in the federal court action, characterized Manganella’s misconduct as in violation of the company’s code of business conduct. The company’s reason for adopting that characterization is hardly mysterious; under the terms of the Stock Purchase Agreement, a willful violation of the code of business conduct could result in the company recouping seven million dollars of the purchase price, while conduct constituting cause for termination under the other provisions of the definition in the employment agreement would not have that result. But nothing in the company’s communications to Manganella ever disavowed any of the additional characterizations it now asserts. Nor does anything in the record indicate that Manganella in any way changed his position to his detriment in reliance on the company’s failure to invoke any of the other provisions of the definition of cause in addition to the asserted ground of violation of the code of business conduct.
In an effort to show detrimental reliance, Manganella argues in his reply memorandum in support of his motion for summary judgment that “the company’s articulation of the reason it terminated Mr. Manganella at the time of his termination and throughout the arbitration induced him to forgo the opportunity to recover his attorneys fees related to litigation of the issues now raised in this action.” He explains that he would have sought to have the issues now raised here addressed in the arbitration, where he had the opportunity to recover fees, which he does not have here. Aside from its utterly speculative nature, this argument ignores the jurisdictional limitations on the scope of the arbitration. As Manganella himself points out in his memorandum in opposition to Jasmine’s motion (p. 3, n.2), the arbitration panel’s jurisdiction was limited to “any controversy, claim, or dispute arising under or relating to whether or not a Major Employment Breach has occurred” within the meaning of the stock purchase agreement, and did not extend to separate issues arising under the employment agreement.[5] The arbitration panel could not have decided more than it did, and could not have awarded Manganella fees for matters beyond the scope of the arbitration.[6]
Since Manganella has not demonstrated any ability to show detrimental reliance on Jasmine’s reference to the code of business conduct, or on its failure expressly to invoke other provisions of the definition of cause, the company is free to rely on as many of those provisions as may apply. As both sides have pointed out, the arbitration panel did not address any issue beyond the single question put to it: whether Jasmine had proven a major employment breach within the meaning of the stock purchase agreement. The panel did, however, find a set of facts that bear directly on the application of the various provisions of the definition of cause. The question is whether the facts found, insofar as they were actually and necessarily determined in the arbitration, either compel or preclude the conclusion that any of those provisions applies to Manganella’s termination. See Alba v. Raytheon Co., 441 Mass. at 843 (“Courts have repeatedly applied the doctrine of [issue preclusion] to a second action asserting a different claim from the first”), citing Green, 53 Mass.App.Ct. at 124-27; Corrigan v. General *283 Elec. Co., 406 Mass. 478 (1990); Martin v. Ring, 401 Mass. 59, 61 (1987); compare Demoulas Super Markets, 70 Mass.App.Ct. at 267 (finding that complaint was not frivolous for purposes of G.L.c. 231, §6F precluded subsequent contention that it was devoid of any reasonable factual support or arguable basis in law for purposes of G.L.c. 231, §59H).
3. Section 5(a) (iii)
Section 5(a) (iii) of the employment agreement defines cause for termination as “willful refusal to comply with any significant, lawful and proper policy, directive or decision of the Board or the Chairman in furtherance of a legitimate business purpose . . . only if not remedied within thirty days after receipt of written notice from the Company.” This language is virtually identical to the definition of major employment breach in the stock purchase agreement, which the arbitration panel found had not been proven because of the failure to provide notice and opportunity to remedy. The panel’s factual findings that that requirement was not met and was not excused were indisputably necessary to determination of the issue before the panel. Those findings compel the conclusion that the termination was not justified by cause as defined under this provision.[7]
4. Section 5(a) (i)
Section 5(a)(1) of the employment agreement defines cause as “intentionally causing the Company to violate a material local state or federal law in any material respect.” To show cause under this definition, the company would have to show that Manganella acted intentionally, that he caused the company to violate a law, and that both the law and the violation of it were material. The arbitrators’ findings, as set forth supra, establish that Managanella, as president of Jasmine, engaged in conduct constituting sexual harassment, and that he did so willfully. Willfully, for this purpose, is indistinguishable from intentionally. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 614-16 (1993) (willful for purposes of Age Discrimination in Employment Act means that employer knew the conduct was prohibited or showed willful disregard of whether it was). Moreover, the arbitration panel specifically found that Manganella was well aware of the law on sexual harassment, since he had previously faced a claim of such conduct in federal court, and had then had the company’s policy on the subject “updated to reflect the law of Massachusetts” (pp. 11-12).
Sexual harassment of an employee by an employer is expressly prohibited by G.L.c. 151B, §4(16A). General Laws c. 151B, §1(18), defines sexual harassment as: sexual advances, requests for sexual favors, and other verbal or physical contact of a sexual nature when (a) submission to or rejection of such advances, requests, or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests, or conduct have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating, or sexually offensive work environment.
The arbitration panel found that Manganella sexually propositioned several employees and inappropriately touched and propositioned one, that the victims did not complain out of fear of adverse consequences, and that the victims were “wounded” by Manganella’s conduct. Those factual findings leave no room for doubt that Manganella’s sexual advances created a hostile work environment for the victims. Where the person committing sexual harassment is a supervisor, Massachusetts law attributes the conduct to the employer. See College-Town Div. of Interco, Inc. v. Mass. Comm’n Against Discrimination, 400 Mass. 156, 165 (1987). Thus, the arbitrator’s findings establish that Manganella intentionally caused the company to violate Massachusetts law. Materiality cannot be open to serious question; the statute, regulations under it promulgated by the Massachusetts Commission Against Discrimination, and myriad cases decided by courts at all levels and by that agency recognize the prohibition on sexual harassment as a matter of substantial importance to employers, employees, and the public. Indeed, the arbitrators found Manganella’s conduct, in their term, “reprehensible” (p. 5). Thus, the arbitrators’ findings, if they bind Manganella here, establish the elements necessary to show cause for his termination under section 5(a)(i).
The findings are binding here if they were essential to the panel’s decision. Manganella argues that they were not, because that decision turned on the lack of notice and opportunity to remedy. The argument ignores the crux of the dispute that was presented to the arbitrators. The company never disputed that it had failed to provide notice and an opportunity to remedy; its position was that it was excused from that requirement on the ground of futility, because Manganella’s misconduct was so egregious that no remedy could be possible. To evaluate that claim, the panel had to determine whether the conduct occurred, and if so, how severe it was. The panel did exactly that, in that sequence, finding that the conduct occurred as alleged, and that it was severe, but that it did not so clearly preclude all possibility of remedy as to render any effort futile. The findings were essential to the outcome, and are therefore binding on the parties in this action. It follows that the arbitrator’s decision establishes, beyond any genuine dispute, that the company terminated Manganella for cause as defined in section 5(a)(i).
5.Section 5(a)(iv)
Having determined that cause existed under section 5(a) (i), the Court need go no further. In the Court’s view, however, the record also establishes cause under 5(a) (iv). That provision defines cause as “any willful or intentional act of Executive that has the effect of injuring the reputation or business of the Company or *284 any of its Affiliates in any material respect.” As has been discussed, the arbitrators’ findings establish that Manganella willfully committed sexual harassment of several employees. The arbitrators credited the testimony of the four employee victims, and further found that “two employees shared information at the time as to the incidents involving them with other employees of the Company” (p. 12).[8] The arbitration panel did not make any finding as to whether Managanella’s conduct has injured the company’s reputation or business; it had no occasion to do so, since its jurisdiction was limited to the issue of major employment breach under the stock purchase agreement. The findings it did make, however, establish that Manganella’s conduct harmed the company’s reputation at least among the complainants and the other employees who learned of it.
The record also discloses that in March of 2007 one of the employees filed a charge against the company with the Massachusetts Commission Against Discrimination based on Manganella’s conduct. The company has moved to dismiss that charge as untimely. Even if the company succeeds in escaping liability on that ground, it has had to incur the cost of defending the claim, at least through the motion to dismiss.
More fundamentally, Manganella’s conduct has effectively made him unavailable to perform the functions of the company’s president for three years after the purchase, as the parties agreed he would do. The stock purchase agreement leaves no doubt that his service in that capacity was a material inducement to the transaction; indeed, that agreement defines major employment breach to include his voluntary resignation. Once the company learned of his conduct, it could hardly leave the status quo in place without subjecting its employees to further risk of harm and itself to liability. Alternatives to immediate termination may have existed, as the arbitration panel suggested, but implementation of any alternative would inevitably have deprived the company of at least some aspects of his functions as president, at least for some period of time. That deprivation in itself constitutes material injury to the company’s business. The arbitration panel’s findings thus establish cause for termination under section 5 (a) (iv), as well as under section 5(a) (i).
5. Other Allegations of the Complaint
For the reasons discussed, the defendant is entitled to judgment as a matter of law on so much of the complaint as alleges breach of the employment agreement based on the termination of the plaintiffs employment. The claims raised in the amended complaint appear to be based largely, but not entirely on the termination; other breaches are alleged as well. What, if any, harm to the plaintiff is alleged to have resulted from those other breaches is not apparent from the complaint, and the parties have not addressed those allegations in the present motions. Accordingly, the Court cannot at this time order entry of judgment. The Court will conduct a status conference to consider what further proceedings are necessary to resolve any remaining aspects of the claims pled.
CONCLUSION AND ORDER
For the reasons stated, the Defendant Jasmine Company, Inc.’s Motion for Summary Judgment is ALLOWED as to so much of the complaint as alleges breach of the employment agreement based on termination of the plaintiffs employment, and is otherwise DENIED. The Plaintiffs Motion for Partial Summary Judgment is DENIED. Counsel are directed to contact the session clerk to schedule a status conference to consider what further proceedings are necessary to resolve the remaining aspects of the plaintiffs claims.

A major employment breach after distribution of the escrow fund at the end of the first year, but within the first three years, would require Manganella to pay the company that amount.

Crystal’s testimony included that he had decided to terminate Manganella’s employment because “he violated our code of conduct and we didn’t believe that someone who could lead a business and subject our associates in the small office to this, I did not want to bring any new people into this environment as a responsible leader of a business, and there was also an issue of liability to the company if we did nothing having a report like this.”

Manganella also asserted as defenses certain alleged breaches of the agreements by Lerner. The arbitrators found that “[t]he proof in this proceeding does not support any of these defenses” (p. 4).

That point was not disputed.

The Court is not persuaded by Manganella’s effort to stretch the phrase “relating to” to encompass matters beyond the subject of a major employment breach under the stock purchase agreement.

Manganella suggests that the arbitration panel in fact did award attorneys fees for services in this case. He bases that assertion on the fact that the panel awarded two million dollars of his claimed total of $2,221,712.03, rather than further reducing his claim as Lerner urged it to do. Manganella’s application for fees claimed $2,221,712.03, all of which, it contended, had been or would be reasonably and necessarily incuixed in connection with the arbitration, including defense of the suit in federal court seeking a preliminary injunction pending arbitration. Lerner objected to the application on the ground, among others, that Manganella had failed to prove that the fees incurred were all in connection with the arbitration; it contended that the amount claimed included fees for services beyond the arbitration, particularly services prior to commencement of the arbitration, advice to Manganella and his wife regarding constructive termination claims and preparation of the complaint in this case, defense of an anticipated challenge to the arbitration award, which the company did not intend to bring, and investigation of a claim brought against the company and Manganella by one of the victims of his harassment. The panel awarded two million dollars, without further explanation. Manganella’s suggested interpretation of that decision rests on nothing more than speculation, which this Court will not adopt.

The company does not argue otherwise.

The arbitrators cited these prior consistent statements as corroboration for the complainants’ testimony, indicating the importance of this finding to their credibility determinations.